**UNITED STATES FIRE INSURANCE COMPANY, Appellant,**

v.

**SCOTTSDALE INSURANCE COMPANY, Appellee.**

No. 05–06–01138–CV.

Court of Appeals of Texas, Dallas.

Jan. 7, 2008.

Rehearing Overruled Aug. 13, 2008.

Brian Scott Martin, Kevin F. Risley, Rodrigo Garcia, Thompson, Coe, Cousins & Irons, L.L.P., Houston, TX, for Appellant.

Randall G. Walters, Gregory R. Ave, Walters, Balido & Crain, L.L.P., Dallas, TX, for Appellees.

Before Justices WHITTINGTON, WRIGHT, and FITZGERALD.

## OPINION

Opinion by Justice FITZGERALD.

Appellant United States Fire Insurance Company provided a primary policy of liability insurance to a company that operated or owned a number of nursing homes. Appellee Scottsdale Insurance Company was an excess insurer for the same insured. Scottsdale paid monies to defend and settle certain claims against the insured and sued U.S. Fire as the insured's subrogee, asserting that U.S. Fire had not paid all the monies it owed under the primary insurance policy. The trial court granted summary judgment for Scottsdale. We affirm in part, affirm as modified in part, reverse and render in part, and reverse and remand in part.

## I. Background

### A. The underlying claims

The insured in this insurance-coverage dispute is LTC Healthcare, Inc., now known as CLC Healthcare, Inc., a company engaged in the business of operating or owning nursing homes in Texas, Florida, and other locations. U.S. Fire issued a liability insurance policy to LTC effective for the period from March 18, 2000 through March 18, 2001. Scottsdale issued an umbrella policy to LTC effective for the same time period. The Scottsdale policy was excess to the U.S. Fire policy.

A number of claims against LTC surfaced in 2001 and thereafter. Two of LTC's facilities gave rise to the underlying claims that are relevant to this case. One facility was known as the Briarwood Healthcare Center and was located in Texas. The other was known as the Eden Springs facility and was located in Florida. Ultimately, seven lawsuits were filed against LTC in Texas involving claims for personal injury and/or wrongful death arising from the care and treatment provided by or at the Briarwood facility. U.S. Fire defended LTC in two of the seven Briarwood suits and contributed a total of $810,000 to the settlement of those two suits. U.S. Fire then took the position that the seven Briarwood suits were collectively subject to a $1 million per location aggregate limit under its policy, and that it therefore owed only $190,000 in coverage towards the five remaining Briarwood suits. Scottsdale disputed U.S. Fire's position and argued that U.S. Fire's aggregate limit for the Briarwood suits was $2 million. U.S. Fire and Scottsdale then struck an agreement that Scottsdale could settle the five remaining Briarwood suits on the best terms available and litigate the coverage dispute at another time. U.S. Fire contributed its $190,000 towards the settlement of one of the five remaining Briarwood suits, and Scottsdale made substantial monetary contributions towards the settlement of four of those suits. One Briarwood suit remained pending at the time of this litigation between Scottsdale and U.S. Fire.

At least four distinct lawsuits against LTC arose from the Eden Springs facility in Florida. U.S. Fire defended and paid $1 million to settle one of the Eden Springs lawsuits. U.S. Fire then advised Scottsdale that it would not contribute to the defense or settlement of any other

Eden Springs claims, again based on the position that a $1 million per location aggregate limit applied to the Eden Springs facility. Scottsdale settled the three other Eden Springs lawsuits against LTC, plus one other claim that arose from the Eden Springs facility and that was never filed as a lawsuit. Scottsdale made substantial monetary contributions towards the defense and settlement of the Eden Springs claims.

According to the summary-judgment orders signed in this case, Scottsdale paid a total of $1,647,766.27 to defend and settle claims against LTC.

## B. The instant coverage litigation

Scottsdale sued U.S. Fire as subrogee of LTC, alleging that U.S. Fire was contractually obligated to indemnify LTC against the underlying claims to the full extent of a $2 million per location aggregate limit and had failed to do so. Scottsdale also sought to recover the defense costs it had spent defending LTC against the underlying claims, on the theory that U.S. Fire contractually owed LTC those defense costs as well. U.S. Fire pleaded that the underlying claims were subject to a $1 million per location aggregate limit and that it therefore had fully complied with its obligations under the policy by paying out $1 million towards the Briarwood claims and $1 million towards the Eden Springs claims. U.S. Fire pleaded in the alternative for equitable reformation of the policy. In support of this counterclaim, it asserted that the parties intended the policy to include a provision that would have provided that claims covered by its policy's Care Providers Professional Liability Coverage Form were not covered under the CGL Coverage Form, and vice versa. U.S. Fire

alleged that the omission of that provision was caused by a mutual mistake.

Both sides sought summary judgment through multiple motions. Pertinent to this appeal, the trial court granted Scottsdale's First Supplemental Evidentiary and No Evidence Motion for Summary Judgment and Scottsdale's Second Motion for Partial Summary Judgment, and it denied U.S. Fire's summary-judgment motions. The trial court ultimately signed a judgment in favor of Scottsdale that reflected its summary-judgment rulings and some stipulations of the parties.[1] The following holdings of the trial court are challenged by U.S. Fire in this appeal:

- All of the underlying claims were covered by both the CGL Coverage Form and the CPPL Coverage Form in the U.S. Fire policy, and the per location aggregate limit under the U.S. Fire policy relevant to the underlying claims was $2 million by virtue of the CGL coverage.
- U.S. Fire was not entitled to reformation of the policy.
- The self insured retention provisions of the policy did not apply to the underlying claims.
- Regarding the Eden Springs claims, Scottsdale made each settlement in good faith, upon a reasonable basis, and for a reasonable amount.
- Regarding the one Eden Springs claim that Scottsdale settled pre-suit, Scottsdale was entitled to recover its investigation costs from U.S. Fire.

## II. Standard of Review

■■■ We review the trial court's summary judgment de novo. When both parties move for summary judgment, each bears the burden of establishing that it is

1. U.S. Fire also filed a third-party petition against LTC. The third-party claims were sev-

ered out by written order prior to the signing of the final judgment in this case.

entitled to judgment as a matter of law. If the trial court grants one motion and denies the other, the non-prevailing party may appeal the granting of the prevailing party's motion as well as the denial of its own motion. We review the summary-judgment evidence presented by both parties and determine all questions presented. We may affirm the trial court's summary judgment, reverse and render judgment for the other party if appropriate, or reverse and remand if neither party has met its summary-judgment burden. *Hackberry Creek Country Club, Inc. v. Hackberry Creek Home Owners Ass'n*, 205 S.W.3d 46, 50 (Tex.App.–Dallas 2006, pet. denied).

To defeat a plaintiff's cause of action on a traditional summary-judgment motion, a defendant must either conclusively negate an element of the plaintiff's claim or conclusively establish every element of an affirmative defense. *Case Corp. v. Hi–Class Bus. Sys. of Am., Inc.*, 184 S.W.3d 760, 776 (Tex.App.–Dallas 2005, pet. denied). To win summary judgment on its own cause of action, a plaintiff must establish every element of its claim as a matter of law. *Nelson v. Regions Mortgage, Inc.*, 170 S.W.3d 858, 864 (Tex.App.–Dallas 2005, no pet.). Evidence favorable to the nonmovant must be taken as true, and every reasonable inference from the evidence must be drawn in favor of the nonmovant. *Hackberry Creek Country Club*, 205 S.W.3d at 50.

Similarly, in reviewing a no-evidence summary judgment we examine the record in the light most favorable to the nonmovant and disregard all contrary inferences. *Id.* A no-evidence summary judgment is proper unless the respondent brings forth more than a scintilla of probative evidence to raise a genuine issue of material fact on the challenged element. *Id.*

## III.  Analysis

### A.  Were the underlying claims subject to the CPPL $1 million per location aggregate limit or the CGL $2 million per location aggregate limit?

In its first issue, U.S. Fire contends that the trial court erred in holding that the underlying claims were covered by the CGL Coverage Form and therefore subject to a $2 million per location aggregate limit. U.S. Fire argues that, read literally, both the CGL Coverage Form and the CPPL Coverage Form provided coverage for the underlying claims, but the two coverages are subject to different per location aggregate limits of $2 million and $1 million respectively. By holding that the underlying claims are covered by the CGL Coverage Form and subject to its higher $2 million per location aggregate limit, U.S. Fire asserts, the trial court effectively rendered the entire CPPL Coverage Form superfluous and meaningless, contrary to Texas law. To avoid this result, U.S. Fire concludes, the court should have held that only the CPPL Coverage Form, which "more specifically addresses the underlying claims against LTC," applies to the underlying claims, thereby reducing the per location aggregate limit to $1 million. Scottsdale contends that the trial court correctly interpreted the policy, in part because the CPPL Coverage Form includes a clause that expressly contemplates this circumstance (i.e., overlapping coverages within the policy) and provides that the highest applicable limit should control.

To resolve this issue, we first set forth the pertinent policy provisions in some detail.

### 1.  The relevant terms of U.S. Fire's policy

The policy affords general liability coverage by virtue of a portion of the policy

that has the heading "Commercial General Liability Coverage Form." This portion is a thirteen-page form. In the CGL Coverage Form, under the heading "Insuring Agreement," U.S. Fire promises to "pay those sums that the insured becomes legally obligated to pay as damages because of 'bodily injury' or 'property damage' to which this insurance applies." Under the same heading, the policy recites, "This insurance applies to 'bodily injury' and 'property damage' only if: (1) The 'bodily injury' or 'property damage' is caused by an 'occurrence' that takes place in the 'coverage territory'; and (2) The 'bodily injury' or 'property damage' occurs during the policy period." Over three pages of exclusions from coverage then follow, including an exclusion for injuries "expected or intended from the standpoint of the insured." The CGL Coverage Form does not contain an exclusion for bodily injuries arising from "professional services."

Later in the policy appears a portion that has the heading "Care Providers Professional Liability Coverage Form." This portion is an eight-page form. Under the heading "Coverage A–Insuring Agreement–Care Providers Professional Liability," U.S. Fire promises to "pay those sums that the insured becomes legally obligated to pay as damages because of injury to which this insurance applies." Under the same heading, the policy recites, "This insurance applies to injury only if: (1) The injury is caused by a 'professional injury incident' that takes place in the 'coverage territory'; (2) The injury occurs during the policy period; and (3) The injury arises

out of the 'insured professional services' to which this insurance applies." About two pages of exclusions from coverage then follow. The CPPL Coverage Form includes the following anti-stacking [2] provision:

> 11. Two or more Coverage Forms or Policies Issued By Us
>
> If this Coverage Form and any other Coverage Form or policy issued to you by us ... apply to the same injury, the aggregate maximum Limits of Insurance under all Coverage Forms or policies shall not exceed the highest applicable Limits of Insurance under any one Coverage Form or policy.

Finally, the policy contains a page entitled "Change Endorsement," which has the subheadings "Endorsement 004" and "Per Location Endorsement." That endorsement states that it amends the policy as follows:

> The application of the commercial general liability limits of
>
> $1,000,000. per occurrence
>
> $1,000,000. products—completed operations aggregate
>
> $2,000,000. general aggregate limit
>
> and the application of the care providers professional liability limits of $1,000,000. per professional injury claim made and $1,000,000. general aggregate limit are amended to apply on a per location basis per form FM 11808 09–99 attached.

### 2. Interpreting the policy

▬▬▬ Under Texas law,[3] the general rules of contract interpretation govern the

---

**2.** "Stacking" generally refers to the "process of obtaining benefits from a second policy on the same claim when recovery from the first policy alone would be inadequate." BLACK'S LAW DICTIONARY 1440 (8th ed.2004).

**3.** Although the facts of the case implicate other states in addition to Texas, we will apply

Texas law because no party has urged that the law of any other forum should govern. *See In re Estates of Garcia–Chapa*, 33 S.W.3d 859, 863 (Tex.App.–Corpus Christi 2000, no pet.) (applying Texas law in absence of any suggestion that other law was applicable).

interpretation of insurance policies. *Grain Dealers Mut. Ins. Co. v. McKee,* 943 S.W.2d 455, 458 (Tex.1997). Our primary goal is to give effect to the written expression of the parties' intent. *Balandran v. Safeco Ins. Co. of Am.,* 972 S.W.2d 738, 741 (Tex.1998). We must read all parts of the policy together, striving to give meaning to every sentence, clause, and word to avoid rendering any portion inoperative. *Id.* This is not, however, an ironclad rule. "Although interpreting an insurance policy to give a reasonable meaning to all provisions is preferable to interpreting the policy in a way that creates surplusage or leaves a portion of the policy useless or inexplicable, surplusage alone does not make an insurance policy ambiguous." *Grain Dealers,* 943 S.W.2d at 458. Parol evidence is not admissible to create an ambiguity, but the contract may be read in light of surrounding circumstances to determine whether an ambiguity exists. *Balandran,* 972 S.W.2d at 741. If, after applying these rules, an insurance policy is subject to two or more reasonable interpretations, it is ambiguous. *Id.* An ambiguous policy will be interpreted in the manner that most favors coverage. *Progressive County Mut. Ins. Co. v. Sink,* 107 S.W.3d 547, 551 (Tex.2003). Thus, if the policy is ambiguous on the relevant question—here, whether the underlying claims are covered under the CGL Coverage Form—we must adopt the construction favoring the insured, and by extension Scottsdale. Accordingly, in order to prevail U.S. Fire must demonstrate that the only reasonable reading of the policy is that the underlying claims are covered only under the CPPL Coverage Form.

U.S. Fire argues that it would be unreasonable to afford CGL coverage to professional-liability claims because that would render the entire CPPL Coverage Form meaningless surplusage. According to U.S. Fire, under this policy as written, every claim that triggers coverage under the CPPL coverage will necessarily also trigger the CGL coverage. And since the CGL coverage is subject to a higher per location aggregate limit than the CPPL coverage, affording a claim coverage under both Forms renders the CPPL coverage meaningless. Therefore, U.S. Fire argues, the only reasonable interpretation of the policy is that claims that are covered under the CPPL Coverage Form are automatically not covered under the CGL Coverage Form, even though they would fit within the literal terms of the CGL coverage.

For support, U.S. Fire relies on *Royal Insurance Co. of America v. Hartford Underwriters Insurance Co.,* 391 F.3d 639 (5th Cir.2004). In that case, a nursing home was insured by both Royal and Hartford, and both policies had a CGL portion and a professional-liability (PL) portion. *Id.* at 640. A wrongful-death claim was made against the insured, and the insurers disputed coverage. *Id.* The CGL portions of the two policies contained identical provisions for pro rata distribution of liability if other insurance were available, but the PL portions contained different "other insurance" clauses. *Id.* Hartford argued that the PL portions of the policies applied and that its other-insurance clause rendered its PL coverage excess to Royal's. *Id.* at 640–41. Thus, the threshold issue for the court was whether the claim was covered by the CGL coverages or the PL coverages. *Id.* at 641–42. The court agreed with Hartford that the PL coverages applied, opining that the CGL coverages applied to accidents like slip-and-falls on the nursing-home premises while the PL coverages applied to claims based on treatment received at the nursing home. *Id.* at 642. Thus, according to U.S. Fire, *Royal Insurance Co.* supports its position that if CGL coverage and PL coverage are pro-

vided by the same policy, the PL coverage alone should apply to claims within its scope.

U.S. Fire also relies on the Texas Supreme Court's opinion in *Evanston Insurance Co. v. ATOFINA Petrochemicals, Inc.*, No. 03–0647, 2006 WL 1195330 (Tex. May 5, 2006) (reh'g granted Oct. 27, 2006). ATOFINA hired an independent contractor, Triple S, to perform work at ATOFINA's refinery. *Id.*, 2006 WL 1195330, at *1. Their contract required Triple S to insure ATOFINA. *Id.* Triple S bought a primary insurance policy from Admiral Insurance Company and an excess policy from Evanston. *Id.* A Triple S worker was killed on the job, Admiral tendered its policy limit, and Evanston denied the claim. *Id.* at *1–2. ATOFINA settled the claim and pursued a claim against Evanston for coverage. *Id.* at *2. The controversy arose because the excess policy contained two definitions of "insured" under which ATOFINA fit. *Id.* at *1–2. The first definition, found in section III.B.5 of the policy, provided that an "insured" included anyone "insured under a policy of 'underlying insurance,'" but it expressly limited the scope of coverage to the same coverage as provided by the underlying insurance. *Id.* at *1. The underlying primary insurance policy excluded coverage for liabilities caused by ATOFINA's sole negligence. *Id.* at *4 n. 3. The second definition of "insured," found in section III.B.6 of the policy, provided that an "insured" included anyone for whom Triple S had agreed to provide insurance, and it did not contain a sole-negligence exclusion. *Id.* at *2. The supreme court held that section III.B.5 applied, including its sole-negligence exclusion, even though no such exclusion appeared in the separate definition of "insured" found in section III.B.6. *Id.* at *3

("By its express language, section III.B.5 applies to the facts of this case. We cannot ignore the limitations in this section simply because section III.B.6 (which contemplates a separate, although equally applicable set of circumstances) is also implicated."). From this case, U.S. Fire draws the broader principle that when two policy provisions potentially provide coverage for the same claim, but one provision contains limitations that the other does not, the more limited provision controls. This principle appears to contradict the well-settled rule that ambiguous insurance policies should be construed in favor of the insured, and we note that the supreme court has granted ATOFINA's motion for rehearing in that case.

Scottsdale responds that U.S. Fire's policy is at least ambiguous as to whether its CGL coverage and CPPL coverage might apply to the same claim, for several reasons. Its principal argument is that the U.S. Fire policy explicitly contemplates that the CPPL coverage might overlap with other coverage provided within the same policy. Scottsdale relies on section IV(11) of the CPPL Coverage Form, which it refers to as a "nonstacking provision." Section IV(11) provides, "If this Coverage Form and any other Coverage Form or policy issued to you by us ... apply to the same injury, the aggregate maximum Limits of Insurance under all Coverage Forms or policies shall not exceed the highest applicable Limits of Insurance under any one Coverage Form or policy." Second, it points out that there is no professional-services exclusion in the CGL Coverage Form. Notably, in *Royal Insurance Co.* the Fifth Circuit relied entirely on Texas and federal cases construing CGL policies that did contain professional-services exclusions. 391 F.3d at 642.[4] Moreover,

---

4. Scottsdale also argues that the policy involved in the *Royal Insurance* case itself con-

tained an exclusion that could have justified the Fifth Circuit's decision. Scottsdale filed

Scottsdale argues, U.S. Fire's representative testified in a deposition that he was familiar with the concept of using exclusions for professional services in CGL policies and that as an underwriter he would use an endorsement to exclude professional services if he wanted to exclude professional liability from CGL coverage. Finally, Scottsdale argues that, contrary to U.S. Fire's position, the CPPL coverage is not superfluous because some claims are covered by the CPPL coverage and not the CGL coverage. In support, Scottsdale cites the case of *Commercial Underwriters Insurance Co. v. Royal Surplus Lines Insurance Co.*, 345 F.Supp.2d 652 (S.D.Tex. 2004). In that case, a nursing-home resident sued the nursing home for personal injuries, and the jury found by clear and convincing evidence that the resident's harm resulted from "malice." *Id.* at 662. The court concluded, as a matter of Texas law, that the malice finding negated coverage under a policy's CGL coverage part because it (1) negated the existence of an "accident" or "occurrence," and (2) triggered the "expected or intended injury" exclusion in the CGL coverage part. *Id.* at 663. The court appears to have assumed that coverage was still available under the professional-liability portion of the policy. *Id.* at 666–67.

■ Construing the policy as a whole, we reject U.S. Fire's contention that its CPPL coverage alone should apply to the underlying claims, to the exclusion of the CGL coverage. Several factors lead us to this conclusion. First, U.S. Fire does not dispute that the underlying claims do come within the literal terms of both the CGL coverage and the CPPL coverage. A reasonable person reading the policy as a whole could therefore conclude that both coverages apply to the claims.

Second, we agree with Scottsdale that U.S. Fire's central argument is simply wrong. Under our reading of the policy, the CGL coverage does not completely subsume the CPPL coverage so as to render the latter superfluous. In some respects, the CGL coverage is more limited than the CPPL coverage. For example, the CGL coverage requires an "occurrence," defined as an "accident." The CPPL coverage does not require an "occurrence." The CGL coverage also contains an exclusion for bodily injury that is "expected or intended from the standpoint of the insured." The CPPL coverage does not contain an exclusion for expected or intended injuries. Finally, the CGL coverage applies to "bodily injury," but the CPPL coverage applies to "injury." "Bodily injury" is a narrower category than "injury." *See Trinity Universal Ins. Co. v. Cowan*, 945 S.W.2d 819, 822–25 (Tex. 1997) (holding that "bodily injury" does not include purely emotional injuries). Thus, an injury that arises out of professional services and therefore triggers coverage under the CPPL Coverage Form may not trigger coverage under the CGL Coverage Form because there is no "occurrence," or no "bodily injury," or both. *See Commercial Underwriters Ins. Co.*, 345 F.Supp.2d at 662–63. Such a claim would therefore be subject to the lower per location aggregate limit applicable to the CPPL coverage. Thus, affording both CGL and CPPL coverage to claims that are covered by both Forms does not render the CPPL coverage meaningless in all cases.

■ Third, we decline to adopt U.S. Fire's construction of the policy because it

the briefs from the *Royal Insurance* case as part of its summary-judgment evidence in this case, and one brief does indicate that there was a medical-incident exclusion in the CGL portion of its policy. The Fifth Circuit, however, did not mention that exclusion in its opinion.

asks us to insert an exclusion into the CGL Coverage Form that simply is not present. The professional-services exclusion is a feature of many CGL policies, as is evident from cases and commentators discussing that exclusion. *See, e.g., Utica Nat'l Ins. Co. of Tex. v. Am. Indem. Co.*, 141 S.W.3d 198, 199 (Tex.2004) ("In this case, we must interpret the scope of a professional services exclusion in a general liability insurance policy."); 2 ALLAN D. WINDT, INSURANCE CLAIMS AND DISPUTES: REPRESENTATION OF INSURANCE COMPANIES AND INSUREDS § 11:16 (5th ed.2007) ("Liability policies typically eliminate coverage for injury or damage that results from the rendering or the failure to render a professional service."); *see also* 1 SUSAN J. MILLER & PHILIP LEFEBVRE, MILLER'S STANDARD INSURANCE POLICIES ANNOTATED 448.0 (1995) (containing a professional-services exclusion identified as Form CGEX 052). We will not rewrite contracts to insert provisions that parties could have included themselves. *In re Mktg. Investors Corp.*, 80 S.W.3d 44, 48 (Tex.App.–Dallas 1998, orig. proceeding). The absence of a professional-services exclusion implies a certain degree of overlapping coverage by both the CPPL and the CGL Coverage Forms.

Finally, we agree with Scottsdale that the nonstacking provision in the CPPL Coverage Form shows that its interpretation of the policy is correct. Section IV(11) clearly indicates an awareness by the parties that the coverage provided by the CPPL Coverage Form could overlap with the coverage provided by other Forms within the same policy. If U.S. Fire had wanted the CPPL limits to control in any claim within the CPPL coverage, this nonstacking provision could have provided that, in the event of overlap, the aggregate maximum limits for an injury would not exceed the limits of insurance applicable under the CPPL Coverage Form. Instead, section IV(11) provides that in the event of overlap, the aggregate maximum limits under all Coverage Forms shall not exceed the highest applicable limits under any one Coverage Form. In short, the parties expressly stated an intent that LTC would enjoy the highest applicable limits if the coverage under the CPPL Coverage Form overlapped with other coverage provided by another form within the same policy. Thus, the trial court correctly held that the CGL Coverage Form, with its higher per location aggregate limits, applies to the underlying claims.

We overrule U.S. Fire's first issue.

## B. Did the trial court correctly dismiss U.S. Fire's counterclaim for equitable reformation of the policy?

U.S. Fire pleaded in the alternative for the equitable remedy of reformation, asserting that "the U.S. Fire Policy should be reformed to state that the CGL Form ... does not cover claims that are covered by the Professional Liability Form or that would be covered by the Professional Liability Form but for the exhaustion of policy limits." U.S. Fire's ground for the remedy was a mutual mistake by itself and LTC. Scottsdale filed a summary-judgment motion attacking U.S. Fire's counterclaim for reformation on both traditional and no-evidence grounds. Scottsdale contended that there was no evidence that LTC possessed an understanding that the policy would exclude claims covered by the CPPL portion from coverage by the CGL portion. The trial court granted Scottsdale's motion without specifying the grounds. In its second issue on appeal, U.S. Fire contends that it raised a fact issue on the issue of mutual mistake.

Reformation requires proof of two elements: (1) an original agreement and (2) a mutual mistake, made after the

original agreement, in reducing the original agreement to writing. *Beneficial Standard Life Ins. Co. v. Trinity Nat'l Bank,* 763 S.W.2d 52, 56 (Tex.App.–Dallas 1988, writ denied). "One seeking reformation of a written instrument must prove that the erroneously written, included or omitted provision in the instrument was there [or was omitted] by mutual mistake." *Huttleston v. Beacon Nat'l Ins. Co.,* 822 S.W.2d 741, 746 (Tex.App.–Fort Worth 1992, writ denied). Thus, proof of the opposing party's prior agreement to the omitted term is an essential element of the equitable remedy of reformation. *See generally Champlin Oil & Ref. Co. v. Chastain,* 403 S.W.2d 376, 382 (Tex.1965).

As evidence of LTC's intent, U.S. Fire relies on two pieces of evidence: the affidavit of an expert witness, Michael Sean Quinn, and a one-page document ed thereto. In his affidavit, Quinn testifies that he has reviewed the documents ed to his affidavit, and that one of those documents is a "policy binder" or "insurance binder." He further testifies that a "binder" is "a temporary contract of insurance, used to record the giving of protection pending the execution and delivery of a more conventionally detailed policy of insurance." *Accord* BLACK'S LAW DICTIONARY 178 (8th ed.2004) (defining "binder" as "[a]n insurer's memorandum giving the insured temporary coverage while the application for an insurance policy is being processed or while the formal policy is being prepared"). That "policy binder" is a one-page document that appears on the letterhead of Swett & Crawford (which is also the "Agent" listed on the Common Policy Declarations page of the policy), references the policy specifically by number, and under the heading "Other Conditions" recites "Attach: Professional Liability Coverage Part, EBL Specified Location Endt, Non Stacking endorsement (if claim is covered under the professional it is ex-

cluded under the GL and vice versa). . . ." Quinn relies on the policy binder and a handful of other documents, such as emails, that repeat the emphasized language from the policy binder to reach his ultimate conclusion that "[t]hese documents demonstrate that both U.S. Fire and LTC Healthcare, Inc. n/k/a CLC Healthcare, Inc. understood and intended that a non-stacking endorsement would be included in the policy." According to U.S. Fire, the Quinn affidavit and the policy binder are sufficient to raise a genuine issue of fact as to the essential element of a prior agreement between LTC and U.S. Fire not reflected in the policy.

Scottsdale contends that the policy binder does not raise a genuine fact issue as to LTC's intent because U.S. Fire adduced no evidence to provide a "foundation for admission" of the document and because the document "is pure hearsay without any context or meaning." Reviewing the record, we find that the policy binder actually appears in U.S. Fire's summary-judgment evidence twice—once attached to the Quinn affidavit, and once attached to an affidavit by U.S. Fire's counsel. Scottsdale objected to the copy of the policy binder attached to the affidavit of U.S. Fire's counsel for lack of authentication, and the trial court sustained that objection.

■ Although Scottsdale did not object to Quinn's affidavit testimony that LTC "understood and intended that a non-stacking endorsement would be included in the policy," we conclude that this statement also constitutes no evidence to support U.S. Fire's claim. The Texas Supreme Court has held that expert testimony that is nonprobative on its face, such as testimony that is conclusory or speculative, constitutes no evidence whether it is objected to or not. *Coastal*

*Transp. Co., Inc. v. Crown Cent. Petroleum Corp.*, 136 S.W.3d 227, 233 (Tex. 2004); *accord Sparks v. Booth*, 232 S.W.3d 853, 863 (Tex.App.–Dallas 2007, no pet.). "An expert opinion is conclusory when it offers an opinion with no factual substantiation. . . . The expert must explain how he reached his conclusion." *Sparks*, 232 S.W.3d at 863. Here, we conclude that Quinn's opinion regarding LTC's state of mind amounts to no more than nonprobative speculation. Although the unauthenticated documents attached to his affidavit do refer to LTC, the documents do not indicate on their face that LTC ever saw them, much less assented to any terms found in them. Quinn's testimony about LTC's understanding and intention based on those documents is mere speculation and guesswork, and it constitutes no evidence that LTC actually agreed to the "nonstacking endorsement" that U.S. Fire seeks to reform the policy to include. *See Buls v. Fuselier*, 55 S.W.3d 204, 209 (Tex. App.–Texarkana 2001, no pet.) (holding that expert's opinion that doctor performed surgeries in order to avoid financial losses due to insurance deductibles was "nothing more than conjecture and speculation").

In sum, we hold that U.S. Fire failed to raise a genuine issue of material fact on an essential element of its counterclaim for reformation, and the trial court properly granted Scottsdale's no-evidence motion for summary judgment as to that counterclaim. It is therefore unnecessary to consider the merits of Scottsdale's traditional motion for summary judgment on that counterclaim. We overrule U.S. Fire's second issue.

## C. Did the trial court correctly disregard the self-insured-retention provisions of the policy?

In its third issue, U.S. Fire contends that the trial court erred by not reducing Scottsdale's recovery by the amount of LTC's self-insured retentions (SIRs) under the policy. Scottsdale contends that the SIR provisions of the policy were inapplicable to the underlying claims, and alternatively that U.S. Fire waived those provisions when it breached its duties to defend and indemnify LTC. We rule in favor of U.S. Fire on both issues.

**1. U.S. Fire has not waived compliance with the SIR provisions of the policy.**

Scottsdale relies on the principle that "an insurer cannot insist upon compliance with the conditions of its policy under which it agrees to provide a defense and furnish liability coverage after it has been given the opportunity to defend and wrongfully refuses to do so." *St. Paul Ins. Co. v. Rahn*, 641 S.W.2d 276, 278 (Tex.App.–Corpus Christi 1982, no writ). According to Scottsdale, U.S. Fire waived any SIRs that might have applied to the underlying claims by breaching its duty to defend and indemnify LTC. U.S. Fire acknowledges that an insurer's breach of contract will excuse some breaches of policy conditions by the insured, but it contends that the insurer's breach does not excuse the insured from all of its contractual obligations. A self-insured retention, U.S. Fire argues, is not waived by an insurer's failure to defend.

We conclude that the cases relied on by Scottsdale are inapposite. Most of them hold that an insurer's breach of the duty to defend excuses the insured from complying with a "no action" clause that limits the insurer's liability to cases in which a judgment has been rendered against the insured after a trial or a settlement has been reached to which the insurer is a party. *E.g., Gulf Ins. Co. v. Parker Prods., Inc.*, 498 S.W.2d 676, 679 (Tex. 1973); *St. Paul Ins. Co.*, 641 S.W.2d at

278. One holds that an insurer's wrongful denial of a defense waives policy requirements that the insured give the insurer notice of suit and forward suit papers to the insurer. *Womack v. Allstate Ins. Co.,* 156 Tex. 467, 296 S.W.2d 233, 237 (Tex. 1956). None holds that the insurer's erroneous denial of a defense or indemnity excuses an insured from performing its obligations under an SIR.

We agree with U.S. Fire that its refusal to defend and indemnify LTC after expending $1 million to settle Briarwood claims and $1 million to settle one of Eden Springs claims did not constitute a waiver of the SIR provisions in the policy. This is because the SIR provisions in the policy expressly provide that U.S. Fire owes LTC no duty to defend or indemnify until after LTC's self insured retention limit has been exhausted. Specifically, the policy contains a form entitled "General Liability Self Insured Retention Endorsement[:] Indemnity and Defense Combined." That form provides, in pertinent part:

> Our obligation to pay damages and our duty to investigate, settle and defend claims or "suits" applies only when the amount paid by the insured either as damages, or as expenses for the investigation, settlement or defense of claims or "suits" . . . , or both combined . . . exceeds the "Self Insured Retention" limit.

Thus, U.S. Fire's duties to defend and indemnify were not triggered until the SIRs were exhausted. *See GuideOne Elite Ins. Co. v. Fielder Road Baptist Church,* 197 S.W.3d 305, 310 (Tex.2006) (the duty to defend is created by the terms of the insurance policy); 2 ALLAN D. WINDT, INSURANCE CLAIMS AND DISPUTES: REPRESENTATION OF INSURANCE COMPANIES AND INSUREDS § 11:31 (5th ed.2007) ("The

difference between a self-insured retention and a deductible is usually that, under polices containing a self-insured retention, the insured assumes the obligation of providing itself a defense until the retention is exhausted."). If LTC itself had funded the defenses or settlements of the underlying claims, it would have no claim against U.S. Fire under the policy for amounts within the SIRs. *See generally H.E. Butt Grocery Co. v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.,* 150 F.3d 526 (5th Cir.1998) (holding that insured's settlements of two claims were each subject to the SIR provisions of the policy). Accordingly, U.S. Fire's refusal to defend or indemnify LTC did not waive the SIR provisions of the policy.

**2. The SIR provisions of the policy apply to the underlying claims, regardless of which coverage Form supplies the coverage.**

■ The policy's general self-insured-retention endorsement form is not complete. Its opening sentence recites, "This endorsement modifies insurance provided under the following:" and is followed by a large blank space. Also, nowhere in that endorsement does it state the amount of LTC's self-insured-retention limit. For these pieces of information, the reader must consult a different page of the policy labeled "Endorsement 003." According to Scottsdale, Endorsement 003 applies the SIR provisions only to the coverage provided under the CGL Coverage Form, not to the coverage provided under the CPPL Coverage Form. Scottsdale argues that this means that the underlying claims against LTC were not subject to an SIR at all, and that the trial court therefore correctly refused to deduct anything from Scottsdale's recovery against U.S. Fire. U.S. Fire argues that Endorsement 003

clearly extends the SIR provisions of the policy to all coverages afforded under either coverage Form, and that the trial court erred by failing to deduct the proper SIR amounts from Scottsdale's recovery.

After reviewing the pertinent policy provisions, we agree with U.S. Fire.

### a. The relevant terms of U.S. Fire's policy

The part of the policy that we must interpret is the applicability provision at the top of Endorsement 003. That section of the Endorsement looks like this:

COVERAGE PART INFORMATION–Coverage parts affected by this change as indicated by ⊠ below.

| | |
|---|---|
| ⊠ | Commercial Property |
| ⊠ | Commercial General Liability |
| ⊠ | Commercial Crime |
| ⊠ | Commercial Inland Marine |
| ⊠ | _____ |
| ⊠ | _____ |

So the SIR provisions of the policy apply to the "Commercial General Liability" "coverage part" of the policy. But the policy is not divided into segments labeled "coverage parts." In urging their views of what constitutes a "coverage part" under this policy for purposes of Endorsement 003, the parties direct us to the following portions of the policy.

The first page of the policy is entitled "Common Policy Declarations" and includes the following table:

This policy consists of the following coverage parts for which a premium is indicated. Where no premium is shown, there is no coverage. This premium may be subject to adjustment.

This policy consists of the following coverage parts for which a premium is indicated. Where no premium is shown, there is no coverage. This premium may be subject to adjustment.

| Coverage Part(s) | Premium |
|---|---|
| Commercial Property Coverage Part | $  NOT COVERED |
| Commercial General Liability Coverage Part | $  1,010,000.00 |
| Commercial Crime Coverage Part | $  NOT COVERED |
| Commercial Inland Marine Coverage Part | $  NOT COVERED |
| Commercial Auto (Business or Truckers) Coverage Part | $  NOT COVERED |
| Commercial Garage Coverage Part | $  NOT COVERED |
| Total Policy Premium | $  1,010,000.00 |

The second page of the policy is entitled "Schedule of Forms and Endorsements" and is essentially a table of contents for the rest of the policy. That table provides as follows:

Common Policy Forms and Declarations

| | | |
|---|---|---|
| FM 206.0.6 | 04–94 | Common Policy Declaration |
| FM 206.0.2 | 04–94 | Schedule of Forms and Endorsements |
| FM 206.0.11 | 09–96 | Signature Page—US Fire |
| FM 206.0.3 | 04–94 | Schedule of Locations |
| IL 00 17 | 11–98 | Common Policy Conditions |
| IL 00 21 | 04–98 | Nuclear Energy Liability Exclusion Endt |
| IL 00 70 | 07–99 | CA Changes—Cancellation & Nonrenewal |

General Liability Forms and Endorsements

| | | |
|---|---|---|
| FM 210.0.2 | 04–94 | Composite Schedule |
| FM 101.0.1252 | 12–90 | Absolute Asbestos Exclusion |
| FM 101.0.1261 | 03–91 | Absolute Asbestos Exclusion |
| CG 00 01 | 07–98 | CGL Cov Form (Occurrence) |
| FM 101.0.1404 | 04–94 | Comm GL Cov Part Supp Declaration |
| CG–01 | 04–94 | Manuscript Endorsement |
| FM 210.0.400 | 07–93 | Pollution Exclusion |
| FM 210.0.402 | 07–93 | Changes in CGL |
| FM 101.0.1410 | 04–94 | Employee Benefits Liab Cov Part |
| CG 00 55 | 03–97 | Amendment of Other Insurance Condition |
| CG 21 60 | 09–98 | Excl YR 2000 Comp Related and Others |
| FM 101.0.1206 | 01–98 | GL Enhancement Endt |
| FM 101.0.1459 | 03–95 | Add's Insd–Owners, Contr, Mgrs. |
| CG 21 35 | 01–87 | Excl–Cov C–Medical Payments |
| CG 21 47 | 07–98 | Employment–Related Practices Exclusion |
| FM 11808 | 09–99 | Care Providers Professional Liab Cov Fm |
| FM 206019 | 01–97 | Composite Rating Plan Endorsement |
| FM11401142 | 10–96 | GL Self Insured Retention Endorsement |

Computer Produced Forms

| | | |
|---|---|---|
| FM 206.0.9 | 04–94 | Change Endorsement |
| FM 206.0.7 | 04–94 | Schedule of Location Changes |

Fill–in Forms Required—Manually Attach

| | | | |
|---|---|---|---|
| FM 206019 | New | 01–97 | Composite Rating Plan Endorsement |

The policy's "General Liability Self Insured Retention Endorsement" contains the following provision:

> Our obligation to pay damages and our duty to investigate, settle and defend claims or "suits" applies only when the amount paid by the insured either as damages, or as expenses for the investigation, settlement or defense of claims or "suits" ... exceeds the "Self Insured Retention" limit.

"Self Insured Retention" is further defined in that endorsement as:

> a. That portion of all sums the insured becomes legally obligated to pay as damages to which this insurance would apply, and
>
> b. All expenses incurred by the insured in the investigation, settlement, or defense of claims or "suits" seeking damages which would be covered by this insurance[.]

Finally, we note the provisions in Endorsement 003 that specify LTC's self-insured-retention limits:

1. The self insured retention for Florida locations is agreed to be $500,000. per occurrence.

2. The all-other-states self insured retention remains at $50,000. per occurrence.

3. The aggregate self insured retention is increased from $500,000. to 2,500,-000. [sic] with a maintenance self insured retention, per occurrence, for each and every claim thereafter of $25,000.

We turn to the parties' arguments.

**2. Interpreting the policy**

It is undisputed that the marked box on Endorsement 003 means that the SIR pro-

visions apply to the "Commercial General Liability" coverage "part." According to U.S. Fire, the CGL Coverage Form and the CPPL Coverage Form are both "commercial liability coverages" within a single CGL coverage "part," so Endorsement 003 applies to both, and the SIRs apply to all the underlying claims. Scottsdale disagrees, contending that the "Commercial General Liability" coverage "part" referred to in Endorsement 003 is identical to the "CGL Coverage Form" and that the CPPL Coverage Form is a separate coverage "part." In other words, Scottsdale contends that "part" and "Form" mean the same thing in this policy. Accordingly, in Scottsdale's view, Endorsement 003 applies to the CGL Coverage Form and not to the CPPL Coverage Form, and therefore the trial court correctly refused to deduct anything from Scottsdale's recovery.

We conclude that U.S. Fire's interpretation of the policy is reasonable and Scottsdale's is not. First, as U.S. Fire points out, the policy uses the term "part" in some places and "form" in others, suggesting that they have different meanings. For example, Endorsement 003 contains a checklist of several "parts" to choose from, and although "Commercial General Liability" is listed, "Care Providers Professional Liability" is not. But elsewhere in the policy is a "Composite Rating Plan Endorsement" that contains a checklist of "forms" rather than "parts" as follows:

This endorsement modifies the insurance provided under the following checked form:

☒ Commercial General Liability Coverage Form

☐ Business Auto Coverage Form

☐ Truckers Coverage Form

☐ Motor Carrier Coverage Form

☒ Care Providers Professional Liability Coverage Form

This suggests that the CGL and CPPL coverages are found in different "Forms" but not necessarily different "parts." Second, we note a parallelism between the Schedule of Forms and Endorsements, which lists both the CGL Coverage Form and the CPPL Coverage Form under the heading "General Liability Forms and Endorsements," and the general SIR endorsement, which is entitled "General Liability Self Insured Retention Endorsement." The twin references to "General Liability" further indicate that the parties intended the SIR provisions to apply to all forms and endorsements listed under the heading "General Liability Forms and Endorsements"—including the CPPL Coverage Form.

Third, and most compelling, is the policy's declaration page, which lists six potential coverage parts. Five are marked "NOT COVERED," and only one is listed with a premium—a $1,010,000 premium for the "Commercial General Liability Coverage Part." The total policy premium is separately stated as $1,010,000. U.S. Fire contends that this means that the entire policy consists of a single CGL Coverage Part, which is a reasonable interpretation. By contending that the CPPL Coverage Form is a separate coverage part, Scottsdale necessarily argues that it is a coverage part that is not listed on the declarations page and for which LTC paid no premium. It is unreasonable to construe a policy to extend coverage under a separate coverage part for which the insurance carrier is charging zero additional premium. The only reasonable reading of the policy, in light of the declarations page, is that the CGL Coverage Form and the CPPL Coverage Form are subsumed within a single Commercial General Liability Coverage Part for which U.S. Fire charged a premium of $1,010,000. The Composite Rating Plan Endorsement reinforces this inter-

pretation because it refers to both Coverage Forms and contains a notation that the single advance premium to be paid is $1,010,000. By referring to both Coverage Forms and stating the same premium as the declarations page, this Endorsement strongly reinforces the interpretation that both Coverage Forms in this policy are subsumed within a single "coverage part" for purposes of Endorsement 003.

Despite the clear provisions of the declarations page, Scottsdale argues that the policy is ambiguous with respect to its SIR provisions. Chiefly, it contends that the policy itself seems to refer to the two Forms as separate coverage parts. For example, there is a form nuclear-exclusion endorsement that recites:

This endorsement modifies insurance provided under the following:

Businessowners Policy

Commercial Automobile Coverage Part

Commercial General Liability Coverage Part

Employment–Related Practices Liability Coverage Part

Farm Coverage Part

Products/Completed Operations Liability Coverage Part

Liquor Liability Coverage Part

Pollution Liability Coverage Part

Professional Liability Coverage Part

Owners and Contractors Protective Liability Coverage Part

Railroad Protective Liability Coverage Part

Special Protective and Highway Liability Policy New York Department of Transportation

According to Scottsdale, this means that the CPPL Coverage Form is also a different coverage "part." We disagree, for two reasons. First, this form endorsement lists a plethora of coverage parts that are plainly not part of this policy—in fact the only item listed that matches any of the coverage parts found on the declarations page is "Commercial General Liability Coverage Part." So we do not infer from this form endorsement that all of the coverage parts listed therein necessarily have a counterpart in this policy. Second, the CPPL Coverage Form is very clearly and specifically a *care providers* professional liability coverage form, not a general professional liability coverage form. We do not think it reasonable to equate "Professional Liability Coverage Part" with "Care Providers Professional Liability Coverage Form."

Scottsdale also cites the Composite Rating Plan Endorsement in the policy as supporting its interpretation. As we have already explained, that portion of the policy actually supports U.S. Fire's position. Scottsdale also relies on certain deposition testimony to try to create an ambiguity, but that, of course, is an improper use of parol evidence. *King v. Cirillo*, 233 S.W.3d 437, 440 (Tex.App.–Dallas 2007, pet. filed).

We hold that the Commercial General Liability coverage part to which Endorsement 003 applies embraces both the CGL Coverage Form and the CPPL Coverage Form.[5] Accordingly, we sustain U.S. Fire's third issue and hold that the SIR provi-

5. Even if we were to hold that Endorsement 003 applies only to the CGL coverage, we are not certain that this would lead to the result desired by Scottsdale. That is, we are not certain that Scottsdale could properly claim the benefit of the higher per location aggregate limit under the CGL Coverage Form without also accepting the self-insured retention that even Scottsdale admits would apply to that Form. Given our disposition of U.S. Fire's issue, however, we need not and do not express any opinion on this question.

sions of the policy apply to the underlying claims.

### 3. Relief

U.S. Fire does not clearly state how the judgment must be changed based on the application of the policy's SIR provisions. We have reviewed the record and determined the following. U.S. Fire filed a motion for partial summary judgment against Scottsdale based on the SIR provisions in which it addressed three Eden Springs claims that had already been settled by Scottsdale. These were the *Elizabeth Booth* lawsuit, the *Gavin* lawsuit, and the Surry Booth claim (which was never filed as a lawsuit). Scottsdale's own evidence proved that its expenditures in those matters were $66,666.67 in connection with the *Elizabeth Booth* lawsuit, $173,648 in connection with the *Gavin* lawsuit, and $63,040.78 in connection with the Surry Booth claim. Each of those amounts is less than the $500,000 per occurrence SIR applicable to Florida claims, so U.S. Fire was entitled to summary judgment as to those underlying claims. Those amounts, totaling $303,355.45, must be deducted from the judgment.

There was one other Eden Springs claim subject to the $500,000 Florida SIR, the *Bouie* lawsuit. Scottsdale's evidence proved that it paid $575,000 to settle that suit. Although we find nothing in the record showing that U.S. Fire ever requested summary judgment against Scottsdale as to the *Bouie* lawsuit based on the SIR, it did assert the SIR in response to Scottsdale's motion for summary judgment, so the trial court erred to the extent it awarded Scottsdale the entire $575,000 associated with the *Bouie* lawsuit. We will deduct $500,000 from the judgment to reflect the Florida SIR applicable to the *Bouie* claim.

As to the Briarwood suits, U.S. Fire argues that the trial court should have applied the applicable $50,000 per occurrence SIR to two of those underlying suits, the *Sylvester* lawsuit and the *Polley* lawsuit. Again, we find in the record no motion for summary judgment by U.S. Fire asserting the SIR as to the *Sylvester* and *Polley* lawsuits, but it did assert the SIR in response to Scottsdale's motion for summary judgment. As to the *Polley* lawsuit, which was still ongoing at the commencement of this appeal, Scottsdale proved defense costs of $50,243.56. As to the *Sylvester* lawsuit, Scottsdale's evidence proved a total expenditure of defense and settlement costs of $85,040.42. Each amount must be reduced by $50,000 to account for the SIR. Thus, as to the Briarwood suits, U.S. Fire is entitled to a $100,000 reduction in the judgment in light of our ruling on the SIR issue.

All totaled, U.S. Fire is entitled to a reduction in the judgment in the amount of $903,355.45 based on the SIR provisions in the policy.

### D. Did Scottsdale conclusively prove its entitlement to the sums it paid to settle the Eden Springs claims?

In its fourth issue, U.S. Fire contends that the trial court erred in awarding Scottsdale the sums it paid to settle the four Eden Springs claims because Scottsdale failed to prove that the settlements were reasonable and made in good faith. According to U.S. Fire, Scottsdale's affidavits addressing this fact issue were conclusory and nonprobative, and the trial court erred in overruling U.S. Fire's objections on that basis.

In order to recover its settlement payments, Scottsdale bore the burden of proving conclusively that its settlements of the Eden Springs claims were made in good faith, upon a reasonable basis, and for a reasonable amount. *Tex. Prop. &*

Cas. Ins. Guar. Ass'n v. Boy Scouts of Am., 947 S.W.2d 682, 692 (Tex.App.–Austin 1997, no writ); accord Comsys Info. Tech. Servs., Inc. v. Twin City Fire Ins. Co., 130 S.W.3d 181, 191 (Tex.App.–Houston [14th Dist.] 2003, pet. denied). The Eden Springs claims were three lawsuits, referred to as the Bouie, Elizabeth Booth, and Gavin lawsuits, plus one claim that was settled pre-suit, referred to as the Surry Booth claim. U.S. Fire does not dispute that Scottsdale proved that it actually paid $575,000 towards the settlement of the Bouie lawsuit, $66,666.67 towards the settlement of the Elizabeth Booth lawsuit, $100,000 towards the settlement of the Gavin lawsuit, and $25,000 towards the settlement of the Surry Booth claim. Rather, U.S. Fire contends that Scottsdale's affidavit proof that the settlements were reasonable were conclusory and nonprobative. See Wadewitz v. Montgomery, 951 S.W.2d 464, 466 (Tex.1997) ("Conclusory statements by an expert are insufficient to support or defeat summary judgment."); accord James L. Gang & Assocs., Inc. v. Abbott Labs., Inc., 198 S.W.3d 434, 439 (Tex.App.–Dallas 2006, no pet.).

In Part III.C of our opinion, we have already concluded that the trial court should have granted summary judgment for U.S. Fire as to the Elizabeth Booth lawsuit, the Gavin lawsuit, and the Surry Booth claim. Accordingly, we need not consider those issues under this issue as well, and we limit our discussion to the Bouie lawsuit.

**1. The Bouie lawsuit and settlement**

LTC's lead defense attorney in the Bouie and Elizabeth Booth suits provided an affidavit in which he testified that he was familiar with the allegations and facts of those two cases, and that he participated in the settlement negotiations and documentation for those two cases. He then testified as follows:

The settlement reached on behalf of the defendants in each of the Bouie suit and the [Elizabeth] Booth suit resolved a real potential liability on behalf of the said defendants. Moreover, the suit and the Booth suit settlements were reasonable, necessary, prudent, and in good faith. The resolution of the Bouie suit and the Booth suit on behalf of my clients represented the reasonable, prudent, and good faith settlement of potential liability on the part of my clients.

Scottsdale also relied on the affidavit of its own claims adjuster who handled the Bouie and Elizabeth Booth lawsuits. She testified that each settlement was "necessary, reasonable, in good faith, and resolved a potential liability on the part of LTC."

LTC's attorney also attached an authenticated copy of his summary and evaluation of the Bouie suit, and he attested that the evaluation formed part of the basis for the decision to settle the Bouie suit. The Bouie suit arose from a resident's elopement and subsequent death by heart attack. The attorney's evaluation is about seven pages long, and in it the attorney explained in detail the facts and the evidence pertinent to the defense of Bouie suit. The attorney included a thorough description of the evidence of the resident's previous elopements from the facility and an analysis of the likely testimony from the witnesses in the case. The attorney weighed the evidence and made a settlement recommendation that was close to the ultimate figure of $575,000. Taking the affidavit and the attached evaluation as a whole, we hold that the affidavit was not conclusory with respect to its ultimate conclusion that $575,000 was a reasonable, good-faith settlement of the Bouie case. U.S. Fire points out that in his affidavit the attorney testified that the evaluation was "in part" the basis for the decision to

settle *Bouie*, and it argues that the failure to describe the other factors makes the affidavit conclusory. We disagree. This complaint is more in the nature of a challenge to the reliability of the affiant's methodology or perhaps the sufficiency of the underlying data, not a complaint that the affidavit is conclusory on its face. *Cf. Merrell Dow Pharms., Inc. v. Havner*, 953 S.W.2d 706, 713 (Tex.1997) ("The underlying data should be independently evaluated in determining if the opinion is itself reliable.").

### 2. Conclusion

Scottsdale carried its summary-judgment burden with respect to reasonableness of the settlement amount in connection with the *Bouie* lawsuit. We overrule U.S. Fire's fourth issue as to that lawsuit.

### E. Did the trial court err in awarding Scottsdale the attorneys' fees and defense costs it incurred in investigating the Surry Booth claim?

In its fifth and last issue, U.S. Fire contends that the trial court erred in awarding Scottsdale its attorneys' fees and defense costs incurred in investigating the Surry Booth claim, which Scottsdale settled pre-suit, because U.S. Fire owed LTC no duty to defend in the absence of a "suit" as defined in the policy. We have already held that U.S. Fire was entitled to summary judgment as to those amounts because of the applicable SIR. Accordingly, we cannot grant U.S. Fire any greater relief as to those defense costs than we already have, and we will not consider U.S. Fire's fifth issue.

### IV. Conclusion

For the foregoing reasons, we rule as follows:

- We reverse the trial court's denial of U.S. Fire's Motion for Partial Summary Judgment Against Scottsdale (Claims Within SIR) and render judgment that Scottsdale take nothing as to its defense and settlement costs in connection with the *Elizabeth Booth* lawsuit, the *Gavin* lawsuit, and the Surry Booth claim.
- We reverse in part the trial court's granting of Scottsdale's Second Motion for Partial Summary Judgment, holding that the trial court should have deducted (1) $500,000 from Scottsdale's recovery in connection with the *Bouie* lawsuit, (2) $50,000 from Scottsdale's recovery in connection with the *Polley* lawsuit, and (3) $50,000 from Scottsdale's recovery in connection with the *Sylvester* lawsuit.
- We modify the trial court's award of $1,647,766.27 by reducing it to $744,410.82, affirm the judgment as modified, and reverse and remand the award of prejudgment interest for recalculation.

In all other respects, we affirm the judgment of the trial court.