**TIG INSURANCE COMPANY,**
Appellant/Cross–Appellee

v.

**NORTH AMERICAN VAN LINES, INC.**
and North American Van Lines of
Texas, Inc., Appellees/Cross–Appel-
lants.

No. 05–04–00522–CV.

Court of Appeals of Texas,
Dallas.

Aug. 26, 2005.

Greg Winslett and Matthew Ryan Pickelman, Quilling, Selander, Cummiskey & Lownds, P.C., Dallas, for Appellant.

Robert F. Henderson and David C. Myers, Jackson & Walker, Dallas, for Appellee.

Deborah G. Hankinson, Law Offices of Deborah G. Hankinson, Dallas, Mediator.

Before Justices FITZGERALD, RICHTER, and LANG–MIERS.

## OPINION

Opinion by Justice LANG–MIERS.

This is an insurance coverage dispute. TIG Insurance Company, an excess insurer, appeals the denial of its motion for summary judgment and the granting of summary judgment in favor of its insured, North American Van Lines, Inc. and North American Van Lines of Texas, Inc. (collectively, NAVL). The issue on appeal is whether the limits of the underlying insurance policies were exhausted, triggering indemnification by the TIG policy, and, if so, the amount of that indemnification. We modify the trial court's judgment and remand for recalculation of prejudgment interest.

### BACKGROUND

NAVL became a defendant in a personal injury lawsuit entitled *Emmons v. North American Van Lines*. That suit resulted in a judgment against NAVL in the amount of $8,947,273.60 in actual damages *plus* prejudgment and postjudgment interest for a total judgment of $15,174,289.

NAVL had three layers of insurance coverage which it argues provided coverage for the *Emmons* judgment.

### A.  Self–Funded Retention/USF & G Policy

NAVL contracted with United States Fidelity and Guaranty Specialty Insurance Company (USF & G) to provide a primary Texas trucker's liability policy with a $5,000,000 limit of liability. The policy contained an "Automobile Self–Funded Retention" endorsement (SFR), pursuant to which NAVL was responsible for funding the $5,000,000 liability limit. The policy also contained a provision whereby USF & G would indemnify a portion of "claim expenses," defined to include defense costs, prejudgment and postjudgment interest, attorney's fees, and court costs, when NAVL's legal liability for an accident exceeded the $5,000,000 policy limit.

### B.  The Royal Policy

NAVL contracted with Royal Indemnity Company to provide commercial umbrella liability coverage of $5,000,000 per occurrence with a $5,000,000 aggregate limit in excess of the amount recoverable under the primary underlying insurance, identified in the Royal policy as the USF & G policy. The Royal policy provided coverage for the "ultimate net loss" in excess of the $5,000,000 USF & G policy. "Ultimate net loss" is defined in the main Royal policy and also in an endorsement to that policy. Although the parties disagree about which definition controls, they do not dispute that under either definition, prejudgment and postjudgment interest are included as part of "ultimate net loss."

### C.  The TIG Policy

NAVL also contracted with TIG to provide a "second layer" excess umbrella lia-

bility policy with $25,000,000 coverage per occurrence and a $25,000,000 aggregate limit in excess of Royal's umbrella policy and the primary policy. TIG's policy provided that its coverage is triggered when the "ultimate net loss" exceeded the underlying insurance, in this case $10,000,000. The policy defined "ultimate net loss" as "the amount of the principal sum, award or verdict actually paid or payable in cash in the settlement or satisfaction of claims for which the insured is liable ... after making proper deduction for all recoveries and salvages."

### PROCEEDINGS BELOW

Under its SFR in the USF & G policy, NAVL paid $5,000,000 of the actual damages awarded in the *Emmons* judgment, and Royal tendered its $5,000,000 policy limits, leaving over $5,000,000 of the total judgment unpaid by insurance. NAVL sought indemnification from its TIG policy for the remainder of the judgment amount.

TIG filed this lawsuit seeking a declaration that it has no duty to indemnify NAVL under its excess policy for any portion of the *Emmons* judgment. TIG argued its definition of "ultimate net loss" meant that the underlying insurance had to be exhausted by the payment of actual damages and not "claim expenses" before its coverage was triggered. And because the actual damages in the *Emmons* judgment were under $10,000,000, the combined limits of the USF & G and Royal policies, TIG argued its coverage was not triggered. TIG also argued its coverage was not triggered because all "claim expenses" should have been paid by NAVL and none should have been apportioned to the Royal policy. Had this occurred, the Royal policy limits would have covered the remainder of the actual damages and the TIG coverage would not have been triggered.

NAVL filed a counterclaim against TIG alleging breach of contract, contending the underlying policy limits had been exhausted, that these limits were insufficient to satisfy the *Emmons* judgment, and that TIG owed the remainder of the judgment.

TIG and NAVL both filed motions for summary judgment on their claims. After hearing argument on the competing motions, the trial court issued a letter ruling, holding, in part: (1) the USF & G policy provides $5,000,000 primary insurance plus indemnification of a percentage share of NAVL's "claim expenses," which the court calculated as 44.1%; and (2) NAVL may apportion its share of the "claim expenses" (55.9%) to the Royal policy provided the apportionment is consistent with the terms of the Royal policy. The trial court then allocated the damages and "claim expenses" as follows:

| | Total | USF&G | Royal | TIG |
|---|---|---|---|---|
| Actual Damages | $8,947,274 | $5,000,000 | $1,519,099 | $2,428,175 |
| Prejudgment Interest | $2,488,077 | $1,097,242 | $1,390,835 | 0 |
| Postjudgment Interest | $3,738,938 | $1,648,872 | $2,090.066 | 0 |

TIG objected to the trial court's calculation of the ratio used to apportion "claim expenses." After a supplemental hearing and briefing on whether defense costs should have been included in "claim expenses," the trial court issued a second letter, ruling that defense costs should not be applied against the limits of the Royal policy. Based on its rulings, the trial court denied TIG's motion for summary judgment, granted in part NAVL's motion for summary judgment, and awarded final judgment for NAVL in the amount of

$2,428,175 against TIG, plus interest and attorney's fees.

## ANALYSIS

### A. Standard of Review and Applicable Law

When both parties move for summary judgment, each bears the burden of establishing it is entitled to judgment as a matter of law. *City of Garland v. Dallas Morning News*, 22 S.W.3d 351, 356 (Tex. 2000). If the trial court grants one motion and denies the other, the non-prevailing party may appeal the granting of the prevailing party's motion as well as the denial of its own motion. *Holmes v. Morales*, 924 S.W.2d 920, 922 (Tex.1996). We review the summary judgment evidence presented by both parties and determine all questions presented. *Dallas Morning News*, 22 S.W.3d at 356. We may affirm the trial court's summary judgment or reverse and render the judgment the trial court should have rendered. *Morales*, 924 S.W.2d at 922; *Jones v. Strauss*, 745 S.W.2d 898, 900 (Tex.1988).

When interpreting the terms of an insurance contract, we follow the general rules of contract construction. *State Farm Life Ins. Co. v. Beaston*, 907 S.W.2d 430, 433 (Tex.1995). Our primary concern is to ascertain the true intent of the parties as expressed in the written contract. *Nat'l Union Fire Ins. Co. v. CBI Indus., Inc.*, 907 S.W.2d 517, 520 (Tex.1995); *Vincent v. Bank of Am., N.A.*, 109 S.W.3d 856, 866 (Tex.App.-Dallas 2003, pet. denied). If the contract can be given an exact or certain legal interpretation, it is not ambiguous, and we must interpret the insurance policy's meaning and intent from its four corners. *Houston Lighting & Power Co. v. Tenn–Tex Alloy & Chem. Corp.*, 400 S.W.2d 296, 300 (Tex.1966); *La. Nat'l Gas Pipeline, Inc. v. Bludworth Bond Shipyard, Inc.*, 875 S.W.2d 458, 461 (Tex.App.-Houston [1st Dist.] 1994, writ denied); *Carrabba v. Employers Cas. Co.*, 742 S.W.2d 709, 716 (Tex.App.-Houston [14th Dist.] 1987, no writ).

An ambiguity does not arise merely because the parties to an agreement advance differing interpretations. *Vincent*, 109 S.W.3d at 867; *see Lopez v. Munoz, Hockema & Reed*, 22 S.W.3d 857, 861 (Tex.2000). The contract is ambiguous only if the application of established rules of construction leaves an agreement susceptible to more than one reasonable meaning. *Vincent*, 109 S.W.3d at 867. If a contract of insurance is susceptible to more than one reasonable meaning, we must resolve the uncertainty by adopting the construction that most favors the insured. *Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. Hudson Energy Co., Inc.*, 811 S.W.2d 552, 555 (Tex.1991). In particular, exceptions or limitations on liability are strictly construed against the insurer and in favor of the insured. *Id.* We give effect to the whole policy when construing a particular provision, using each clause to help interpret the others. *Wynnewood State Bank v. Embrey*, 451 S.W.2d 930, 932 (Tex.Civ.App.-Dallas 1970, writ ref'd n.r.e.); *Western Indem. Ins. Co. v. American Physicians Ins. Exch.*, 950 S.W.2d 185, 188 (Tex.App.-Austin 1997, no writ).

### B. Arguments on Appeal

TIG argues the trial court should have granted its motion for summary judgment because the actual damages were less than the combined limits of the USF & G and Royal policies and coverage under the TIG policy was never triggered. Alternatively, TIG argues the trial court miscalculated the amount of indemnification TIG owed NAVL. In its cross-appeal, NAVL argues the trial court should have included defense costs in its calculation of "claim ex-

penses" and apportioned NAVL's share of those costs to the Royal policy, resulting in greater recovery against TIG.

### 1. Coverage for "Claim Expenses"

■ The USF & G policy states:

When the "insured's" legal obligation to pay damages under LIABILITY COVERAGE ... exceeds the self-funded retention amount shown in the above Schedule, we will indemnify you for a portion of the "claim expenses" .... in addition to the applicable Limits of Insurance.

TIG argues this provision means NAVL contracted to pay its share of the "claim expenses," in addition to its SFR, before coverage was triggered under the Royal policy and that NAVL could not pass its obligation to pay those expenses to the Royal policy. The trial court ruled the Royal policy provided coverage for "claim expenses" and allocated a portion of the prejudgment and postjudgment interest as "claim expenses" to Royal under its policy. We agree with the trial court.

Although we can find no cases interpreting this language, the literal meaning of this provision in the USF & G policy is that USF & G's indemnification of a portion of NAVL's "claim expenses," in this case prejudgment and postjudgment interest, is in addition to the policy's limits. The clause does not say that NAVL must pay those expenses out of its own pocket. We can find nothing in this provision or in the USF & G policy as a whole that prevents NAVL from apportioning these expenses to its excess carrier when those expenses are covered by that policy. And we can find nothing in the Royal policy precluding coverage under its terms. In fact, both TIG and NAVL agree the definition of "ultimate net loss" in the Royal policy includes coverage for prejudgment and postjudgment interest. And Royal tendered its $5,000,000 limit, which indicates Royal also believed these "claim expenses" could be apportioned to its policy.

We conclude the trial court did not err in holding that NAVL may apportion its share of the "claim expenses" to the Royal policy.

### 2. Ratio of "Claim Expenses" Apportioned to USF & G

■ Next we examine whether the trial court used the correct ratio in apportioning "claim expenses" to USF & G. Under the USF & G policy,

When the "insured's" legal obligation to pay damages under LIABILITY COVERAGE ... exceeds the self-funded retention ... we will indemnify you for a portion of the "claim expenses" in the ratio that the portion of the total loss in excess of such self-funded retention bears to the total loss payable (inclusive of the self-funded retention) under this policy....

The trial court interpreted this provision as requiring USF & G to indemnify NAVL for 44.1% of the "claim expenses," allowing NAVL to apportion 55.9% of those expenses to the Royal policy. The trial court arrived at this ratio by dividing the total actual damages which exceeded the self-funded retention, or $3,947,274 (actual damages of $8,947,274 minus the SFR of $5,000,000) by the total actual damages including the self-funded retention, or $8,947,274.

The parties agree the trial court correctly calculated the numerator in the ratio as $3,947,274. However, the parties disagree about the court's calculation of the denominator. We conclude the trial court erred in using the total actual damages as the denominator.

The USF & G policy states the denominator in the ratio is the "total loss payable

(inclusive of the self-funded retention) under this policy." The "total loss payable (inclusive of the self-funded retention)" under the USF & G policy is $5,000,000, or the policy limits, because the total loss exceeds the policy limits. When the total loss exceeds the policy limits, as in this case, the denominator cannot be higher than $5,000,000, or it would exceed the "total loss payable . . . under this policy."

■ NAVL does not argue that the language is ambiguous. Instead, it argues that calculating the ratio in this way can lead to absurd results because, in some cases, the ratio could exceed 100% and no insurer would agree to indemnify its insured for more than the amount of "claim expenses."[1] But to adopt NAVL's interpretation of this provision would require us to ignore the language "payable under this policy," and rewrite it to delete that language, which we cannot do under the rules of contract construction. *See Beaston,* 907 S.W.2d at 433; *Vincent,* 109 S.W.3d at 866; *Tan It All, Inc.,* 111 S.W.3d at 679. Applying the correct denominator, USF & G's share of claim expenses is 78.9% and NAVL's share is 21.1%.

As a result, we conclude the trial court erred in calculating the ratio to be used in allocating claim expenses to USF & G. The allocation should be:

|  | Total | USF&G | Royal | TIG |
|---|---|---|---|---|
| Actual Damages | $8,947,274 | $5,000,000 | $3,686,100 | $261,174 |
| Prejudgment Interest | $2,488,077 | $1,963,093 | $ 524,984 | 0 |
| Postjudgment Interest | $3,738,938 | $2,950,022 | $ 788,916 | 0 |

**3. Should defense costs have been allocated as part of "claim expenses"?**

■ Next we consider whether the trial court should have included defense costs in its allocation of "claim expenses" to the Royal policy. NAVL argues that because the definition of "claim expenses" under the USF & G policy includes defense costs, NAVL's share of the defense costs should have been apportioned to the Royal policy. The dispute arises from the Royal policy's two conflicting definitions of "ultimate net loss." In its policy, Royal agreed to pay:

> [T]he Ultimate Net Loss, in excess of the applicable Underlying or Retained Limit, which the Insured shall become legally obligated to pay because of:

(a) Personal Injury

. . .

The policy then provides:

> "Ultimate Net Loss" means: the total sums actually paid or payable as damages in settlement of a claim . . . or in satisfaction of a judgment for which the Insured is legally liable . . . *and also includes* investigation, adjustment, appraisal, appeal and *defense costs* paid or incurred by the Insured with respect to damages covered hereunder.

(emphasis added). However, the Royal policy contains a "Defense Settlement

---

1. We express no opinion on the possible results from such a hypothetical situation as argued by NAVL. NAVL argues, for example, when the judgment is $11,000,000, the ratio would be $6,000,000 divided by $5,000,000, or 120%. However, what would happen if USF & G is faced with those facts is not before us. We must give words their plain, ordinary and generally accepted meaning unless the policy indicates another meaning should apply. *See Evergreen Nat'l Indem. v. Tan It All, Inc.,* 111 S.W.3d 669, 677 (Tex. App.-Austin 2003, no pet.). And we may not ignore words or create an ambiguity when there is none. *See id.* at 678; *Lubbock County Hosp. Dist. v. Nat'l Union Fire Ins. Co. of Pittsburgh,* 143 F.3d 239, 244–45 (5th Cir. 1998).

Amendatory Endorsement" which provides:

> Section IV—Definition—Item 6 "Ultimate Net Loss" is amended as follows:
>> Ultimate Net Loss means: the total sums actually paid or payable as damages in settlement of a claim ... or in satisfaction of a judgment for which the Insured is legally liable.... Ultimate Net loss *does not include* ... (d) investigation, adjustment, appraisal, appeal and *defense costs* paid or incurred by the Insured, with respect to damages covered hereunder, which are payable by [Royal] in addition to the applicable limit of liability of this policy.

(emphasis added).

NAVL argues that because the endorsement only *amends* the definition of "ultimate net loss" and does not *delete and replace* it, as with other endorsements to the policy, the original definition of ultimate net loss must also be given effect. NAVL also argues the amended definition applies only in "drop down" situations, where Royal has a duty to defend NAVL. Because Royal did not owe a duty to defend NAVL in the *Emmons* case, NAVL argues the original definition applies and defense costs are included in Royal's definition of "ultimate net loss" and should have been allocated to its policy limits.

Conversely, TIG argues the two definitions are in conflict and irreconcilable because one definition includes defense costs within the policy's limits and the other definition does not. The trial court agreed and held "the Royal insurance policy does not encompass paying defense costs paid or incurred by NAVL in such a way as to erode the Royal policy limits" and refused to allocate defense costs to Royal.

▮▮▮ An insurance policy and its endorsements should be construed together

unless they are so much in conflict they cannot be reconciled. *Mesa Operating Co. v. Cal. Union Ins. Co.*, 986 S.W.2d 749, 754 (Tex.App.-Dallas 1999, pet. denied). In that case, endorsements to a policy generally supersede and control over conflicting printed terms within the main policy. *Mesa Operating Co.*, 986 S.W.2d at 754; *Mut. Life Ins. Co. v. Daddy$ Money, Inc.*, 646 S.W.2d 255, 259 (Tex.App.-Dallas 1982, writ ref'd n.r.e.); *United States Fire Ins. Co. v. Aetna Cas. & Sur. Co.*, 781 S.W.2d 394, 399 (Tex.App.-Houston [1st Dist.] 1989)(no writ).

The definition of "ultimate net loss" in the main Royal policy includes defense costs; the definition of "ultimate net loss" in the endorsement excludes defense costs. The only difference is that the amended definition contains the additional language, "which are payable by [Royal] in addition to the applicable limit of liability of this policy." NAVL argues the definition of "ultimate net loss" in the amendatory endorsement applies only in situations where Royal owes a duty to defend NAVL. But the language of the amendatory endorsement does not include such a limitation, NAVL cites no authority in support of this argument, and we decline to so hold.

We conclude the trial court did not err in refusing to apportion defense costs against Royal's $5,000,000 policy limits.

**4. "Ultimate Net Loss" Under the TIG Policy**

▮▮▮ TIG agreed to pay:

> the ULTIMATE NET LOSS (1) in excess of all UNDERLYING INSURANCE, and (2) only after all UNDERLYING INSURANCE has been exhausted by the payment of the limits of such insurance for losses arising out of occurrences insured by all of the policies designated in the Declara-

tions as UNDERLYING INSURANCE.

The TIG policy defines "ultimate net loss" as:

> [T]he principal sum, award or verdict actually paid or payable in cash in the settlement or satisfaction of claims for which the insured is liable, either by adjudication or compromise with the written consent of [TIG], after making proper deduction for all recoveries and salvages.

TIG argues its definition of "ultimate net loss" means the USF & G and Royal policy limits had to be exhausted by the payment of actual damages, not "claim expenses," before TIG's coverage was triggered because "principal sum" includes only actual damages. NAVL agrees that "principal sum" means actual damages only. However, NAVL argues, and we agree, that the TIG policy cannot be interpreted to say that the *underlying insurance* must be exhausted by the payment of actual damages only.

 The TIG policy pays for actual damages in excess of the USF & G and Royal policy limits that have been exhausted by the payments of losses arising out of occurrences insured by those policies. The TIG policy does not define "losses" but, as we have seen, the Royal policy included "claim expenses" in its definition of "ultimate net loss." TIG did not exclude "claim expenses" from its definition of "losses ... insured by ... underlying insurance." And an intent to exclude or limit coverage must be expressed in clear and unambiguous terms. *Hudson Energy,* 811 S.W.2d at 555. We can find no such contractual provision in the TIG policy. We conclude the trial court did not err when it held that, by payment of actual damages and "claim expenses," the USF & G and Royal policy limits were exhausted, thereby triggering coverage under the TIG policy.

### CONCLUSION

We conclude the trial court did not err by denying TIG's motion for summary judgment and granting, in part, NAVL's motion. However, because we conclude the trial court used an incorrect ratio in allocating "claim expenses" to USF & G, we modify the trial court's judgment to award NAVL the sum of $261,174 from TIG, and we remand to the trial court for recalculation of prejudgment interest.