**PINNACLE ANESTHESIA CONSULTANTS, P.A.,** Appellant,

v.

**ST. PAUL MERCURY INSURANCE COMPANY, Appellee.**

No. 05–10–00711–CV.

Court of Appeals of Texas, Dallas.

Feb. 9, 2012.

Blake S. Evans, Stephen Wayne Burnett, Schubert & Evans, P.C., Dallas, TX, for Appellant.

James Price Collins, Ashley Frizzell Gilmore, Wilson, Elser, Moskowitz, Edelmand & Dicker, LLP, Dallas, TX, for Appellee.

Before Justices MOSELEY, LANG, and MYERS.

## OPINION

Opinion By Justice MYERS.

This case involves the issue of whether damages for past and future lost earnings due to wrongful termination are excluded from insurance coverage in an employment practices liability insurance policy issued by St. Paul Mercury Insurance Company. Pinnacle Anesthesia Consultants, P.A. appeals the granting of St. Paul's motion for summary judgment, whereby the trial court rendered judgment that those damages were excluded, and the denial of Pinnacle's motion for summary judgment. Pinnacle brings three issues on appeal contending the trial court erred in determining that (a) an exclusion in the policy barred coverage for the damages in this case and (b) the exclusion was not ambiguous. We affirm the trial court's judgment.

## BACKGROUND

Dr. Neal Fisher was an employee and shareholder physician with Pinnacle pursuant to a written employment contract. The contract renewed automatically for successive one-year terms until the agreement was terminated. Dr. Fisher could terminate the contract without cause with ninety days' notice. Pinnacle could not terminate the contract except for "cause" as defined in the agreement. In 2004, Pinnacle terminated Dr. Fisher, and Dr. Fisher sued for breach of the employment contract for terminating him without cause. The jury found that Pinnacle lacked cause to terminate Dr. Fisher. The jury determined that Dr. Fisher's damages from Pinnacle's terminating him without cause included past lost earnings of $900,000 and future lost earnings of $5 million. The trial court rendered judg-

ment in accordance with the jury's verdict.[1] *See generally Pinnacle Anesthesia Consultants, P.A. v. Fisher,* 309 S.W.3d 93 (Tex.App.-Dallas 2009, pet. denied).

Pinnacle had an employment practices liability insurance policy with St. Paul with a limit of $2 million. After being served in the underlying lawsuit, Pinnacle requested a defense and indemnification from St. Paul pursuant to the policy. St. Paul accepted coverage subject to a full reservation of its rights under the policy. After the conclusion of the trial in the underlying lawsuit, the parties filed actions for declaratory judgment seeking declarations of their rights and obligations under the policy. They narrowed their dispute to a single issue—whether the following exclusion in the policy barred coverage for Dr. Fisher's past and future lost earnings: "The Insurer shall not be liable for that part of Loss that constitutes: 1. amounts owed under a written contract or agreement . . . ." The parties presented their arguments in cross-motions for summary judgment with a joint stipulation of facts. The trial court granted St. Paul's motion for summary judgment and denied Pinnacle's motion.

## STANDARDS OF REVIEW

The standard for reviewing a traditional summary judgment is well established. *See Nixon v. Mr. Prop. Mgmt. Co.,* 690 S.W.2d 546, 548 (Tex.1985); *McAfee, Inc. v. Agilysys, Inc.,* 316 S.W.3d 820, 825 (Tex. App.-Dallas 2010, no pet.). The movant has the burden of showing that no genuine issue of material fact exists and that it is entitled to judgment as a matter of law. Tex.R. Civ. P. 166a(c). In deciding whether a disputed material fact issue exists precluding summary judgment, evidence

favorable to the nonmovant will be taken as true. *Nixon,* 690 S.W.2d at 548–49; *In re Estate of Berry,* 280 S.W.3d 478, 480 (Tex.App.-Dallas 2009, no pet.). Every reasonable inference must be indulged in favor of the nonmovant and any doubts resolved in its favor. *City of Keller v. Wilson,* 168 S.W.3d 802, 824 (Tex.2005). "When, as here, both parties move for summary judgment, each party bears the burden of establishing that it is entitled to judgment as a matter of law; neither party can prevail because of the other's failure to discharge its burden." *Hackberry Creek Country Club, Inc. v. Hackberry Creek Home Owners Ass'n,* 205 S.W.3d 46, 50 (Tex.App.-Dallas 2006, pet. denied). We review a summary judgment de novo to determine whether a party's right to prevail is established as a matter of law. *Mid–Century Ins. Co. of Tex. v. Ademaj,* 243 S.W.3d 618, 621 (Tex.2007); *Dickey v. Club Corp. of Am.,* 12 S.W.3d 172, 175 (Tex.App.-Dallas 2000, pet. denied).

In an insurance case, the insured has the initial burden of establishing coverage under the terms of the policy. *Gilbert Tex. Constr., L.P. v. Underwriters at Lloyd's London,* 327 S.W.3d 118, 124 (Tex. 2010); *Ulico Cas. Co. v. Allied Pilots Ass'n,* 262 S.W.3d 773, 782 (Tex.2008). If the insured proves coverage, then the insurer must prove the loss is within an exclusion to avoid liability. *Gilbert Tex. Constr.,* 327 S.W.3d at 124. If the insurer proves that an exclusion applies, the burden shifts back to the insured to show that an exception to the exclusion brings the claim back within coverage. *Id.*

When interpreting an insurance policy, courts apply the general rules of contract construction to ascertain the par-

---

1. Dr. Fisher was also awarded damages of $36,000 for conversion, $400,000 for defamation, and attorney's fees of over $2 million. However, only the $5.9 million awarded for lost earnings is at issue in this case.

ties' intent. *Id.* at 126; *TIG Ins. Co. v. N. Am. Van Lines, Inc.,* 170 S.W.3d 264, 268 (Tex.App.-Dallas 2005, no pet.). Our primary goal is to give effect to the parties' intent as expressed in the written contract. *Gilbert Tex. Constr.,* 327 S.W.3d at 126; *U.S. Fire Ins. Co. v. Scottsdale Ins. Co.,* 264 S.W.3d 160, 167 (Tex.App.-Dallas 2008, no pet.). We read all parts of the policy together, striving to give meaning to all portions while avoiding rendering any portion inoperative. *Gilbert Tex. Constr.,* 327 S.W.3d at 126; *U.S. Fire Ins. Co.,* 264 S.W.3d at 167. Each part of the contract should be given effect, but "[n]o one phrase, sentence, or section [of a contract] should be isolated from its setting and considered apart from the other provisions." *Forbau v. Aetna Life Ins. Co.,* 876 S.W.2d 132, 134 (Tex.1994) (quoting *Guardian Trust Co. v. Bauereisen,* 132 Tex. 396, 121 S.W.2d 579, 583 (1938)).

If the insurance contract can be given an exact or certain legal interpretation, then it is not ambiguous, and we must interpret the insurance policy's meaning and intent from its four corners. *TIG Ins. Co.,* 170 S.W.3d at 268. Parol evidence is not admissible to create an ambiguity, but the contract may be read in light of surrounding circumstances to determine whether an ambiguity exists. *Balandran v. Safeco Ins. Co. of Am.,* 972 S.W.2d 738, 741 (Tex.1998); *U.S. Fire Ins. Co.,* 264 S.W.3d at 167. If, after applying these rules, an insurance policy is subject to two or more reasonable interpretations, it is ambiguous. *Balandran,* 972 S.W.2d at 741; *U.S. Fire Ins. Co.,* 264 S.W.3d at 167. When the ambiguity is in an exclusion from coverage, we "must adopt the construction ... urged by the insured as long as that construction is not unreasonable, even if the construction urged by the insurer appears to be more reasonable or a more accurate reflection of the parties' intent." *Balandran,* 972 S.W.2d at 741 (quoting *Nat'l Union Fire Ins. Co. v. Hudson Energy Co.,* 811 S.W.2d 552, 555 (Tex. 1991)).

## ANALYSIS

### "Amounts Owed Under a Written Contract"

In its first and second issues, Pinnacle argues the trial court erred by granting St. Paul's motion for summary judgment and denying Pinnacle's because the plain language of the exclusion shows Pinnacle's liability to Dr. Fisher for lost earnings was not excluded by the policy.

St. Paul's policy for employment practices liability coverage promised to pay any "Loss" that Pinnacle became legally obligated to pay on account of any "Claim" made against Pinnacle. The policy defined "Loss" as "the amount which the Insureds become legally obligated to pay on account of each Claim ... made against them ... for Wrongful Acts for which coverage applies, including Damages." "Wrongful Acts" included an "Employment Practices Act," which included "wrongful discharge or termination" and "breach of an actual or implied employment contract." "Claim means ... a civil proceeding against any Insured commenced by the service of a complaint or similar pleading." Thus, the policy covered the amounts Pinnacle became legally obligated to pay in a civil suit for wrongful termination or breach of an employment contract. The judgment in the underlying case legally obligated Pinnacle to pay Dr. Fisher damages for breach of his employment contract due to wrongful termination. Therefore, Pinnacle met its burden of establishing coverage under the policy.[2]

2. The parties stipulated that Dr. Fisher's lawsuit constituted a *"Claim"* during the policy

The policy exclusion on which St. Paul relies states: "The Insurer shall not be liable for that part of Loss that constitutes . . . amounts owed under a written contract or agreement. . . ." The damages in the underlying case were for past and future lost earnings. The jury charge in the underlying case defined "Past Lost Earnings" as "the cash value of the earnings Dr. Fisher would have received in the past had Pinnacle not terminated him without 'Cause,' less any amounts actually earned by Dr. Fisher." It defined "Future Lost Earnings" as "the cash value of the earnings Dr. Fisher would, in all reasonable probability, earn in the future, less any earnings, had Pinnacle not terminated him without 'Cause.'" The issue before us is whether this award of damages for past and future lost earnings "constitutes . . . amounts owed under a written contract or agreement."

Pinnacle argues that the exclusion applies only "to a limited subset of contract damages for amounts that were owed to the employee per the express terms of the contract at the time of termination." The "lost earnings" awarded by the jury were not "owed" to Dr. Fisher under the employment contract when he was terminated; therefore, Pinnacle argues, the lost earnings fall outside the exclusion.

In making this argument, Pinnacle examines the phrase "that part of Loss." Pinnacle asserts this phrase means the exclusion was not intended to cover all contract damages generally. Pinnacle asserts the phrase "amounts owed" is in the past tense and therefore applies only to amounts owed in the past, that is, at the time Dr. Fisher was terminated. Pinnacle states that the phrase "owed under a written contract" does not include all damages for breach of contract. Pinnacle argues the exclusion is only for amounts expressly

period and was for an "Employment Prac-

provided for in the contract and not "consequential" damages like lost earnings.

 St. Paul asserts that the policy provision excludes the award for lost earnings in the underlying case because those amounts represent the contract damages Dr. Fisher is owed under the employment contract. *See Greater Fort Worth & Tarrant Cnty. Cmty. Action Agency v. Mims,* 627 S.W.2d 149, 151 (Tex.1982) ("correct measure of damages for wrongful discharge of an employee is the present cash value of the contract to the employee '. . . if it had not been breached, less any amounts that he should in the exercise of reasonable diligence be able to earn through other employment'" (quoting *Dixie Glass Co. v. Pollak,* 341 S.W.2d 530, 538 (Tex.Civ.App.-Houston 1960), *writ ref'd n.r.e.,* 162 Tex. 440, 347 S.W.2d 596 (1961) (per curiam))). Pinnacle promised to continually renew the contract with Dr. Fisher and to pay him accordingly. The lost-earnings damages were the present value of the amount Pinnacle would have had to pay Dr. Fisher if it had not breached the employment contract. St. Paul argues that the $5.9 million in lost earnings is the amount Pinnacle owed Dr. Fisher under the contract for breaching the contract.

We agree with St. Paul's interpretation of the contract.

Citing two dictionaries, Pinnacle asserts the word "constitute" means "make up," "form," "compose," "amount to," or "equal." *See* MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY (11th ed. 2003); THE AMERICAN HERITAGE DICTIONARY OF THE ENGLISH LANGUAGE (4th ed. 2004). We agree; however, the issue is whether the loss is made up, formed, or composed of "amounts owed under a written contract."

tices Act" as defined in the policy.

Pinnacle argues "that part of Loss" means the exclusion must include something less than all contract damages generally:

[T]he exclusion expressly contemplates slicing up the broader "Loss" and only encompassing the portions of "Loss" constituting the amounts "owed." By defining the exclusion to encompass only that "part of" contract damages constituting amounts owed under a contract or agreement, the exclusion necessarily must include *something less* than all contract damages generally.

Pinnacle's argument speaks of "contract damages" instead of damages for breach of a *written* contract. However, it appears that Pinnacle is asserting the phrase "that part of Loss" means there must be damages from breach of a written contract that would not be excluded. This assertion presumes that the "Loss" consists solely of damages for breach of a written contract. This is not a reasonable presumption because the loss could include damages that are not for breach of a written contract, such as damages for breach of an oral contract, quantum meruit, or a tort. Although a judgment against an insured might include these damages as well as those for breach of a written contract, they would not be excluded by the clause. Accordingly, the phrase "that part of Loss" does not mean there must be damages for breach of a written contract that would not be excluded.

We also disagree with Pinnacle's interpretation of the words "amounts owed" as requiring the excluded loss be determined at the termination of the contract because "owed" is in the past tense. The "Loss" is the judgment in the underlying case. "Owed," as a past participle, denotes the action is complete. *See* CHICAGO MANUAL OF STYLE §§ 5.108, .109, at 176 (15th ed. 2003). Thus, the amounts owed under the

written contract are determined at the time of the loss, that is, at the time of the judgment. In this case, the "Loss" included the "amounts owed" of $5.9 million for lost earnings.

 Pinnacle argues the lost earnings are not owed "under the contract" because they are consequential damages. Consequential damages are those damages that "result naturally, but not necessarily, from the defendant's wrongful acts." *Arthur Andersen & Co. v. Perry Equip. Corp.*, 945 S.W.2d 812, 816 (Tex.1997); *see* BLACK'S LAW DICTIONARY 445–46 (9th ed. 2009) (defining "consequential damages" as "[l]osses that do not flow directly and immediately from an injurious act but that result indirectly from the act"). By depriving Dr. Fisher of the ability to work under the employment contract, Pinnacle necessarily deprived Dr. Fisher of the fees he would have earned under the employment contract. Dr. Fisher's lost earnings resulted naturally and necessarily from his wrongful termination. Thus, these were direct damages, not consequential damages. *See Arthur Andersen*, 945 S.W.2d at 816.

We also disagree with Pinnacle's interpretation of "amounts owed under a written contract" as limited to money owed to Dr. Fisher for fees earned but not paid before the termination of the employment contract. The key word in understanding the phrase is "under," which means, in this context, "required by," "in accordance with," or "bound by." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 2487 (1981) (definition 8a of the preposition form of "under"). Because the employment contract provided Dr. Fisher the right to earn the fees, the lost earnings for the present value of the fees Pinnacle wrongfully prevented him from earning were "in accordance with" the employment contract.

Therefore, the lost earnings were "amounts owed under a written contract."

In support of its argument that the "amounts owed under" the employment contract had to be amounts specifically provided for in the contract, Pinnacle cites *Craft Machine Works, Inc. v. United States*, 926 F.2d 1110 (Fed.Cir.1991). In that case, Craft contracted to deliver *assembled* cranes to the federal government. *Id.* at 1111. The cranes' components were shipped to the United States from South Korea. The contract contained a "Cargo Preference Clause," which required Craft to use U.S.-flagged vessels "in the ocean transportation of any *supplies to be furnished under this contract.*" *Id.* The issue before the court was whether the crane components were "supplies to be furnished under this contract." *Id.* at 1113. The court resolved the issue in favor of Craft, determining the crane components were not "supplies to be furnished under this contract":

> The contract's Cargo Preference Clause, however, places the term "supplies" within the clarifying context of the phrase "supplies to be furnished under this contract." This language means that the contract provides the definition of "supplies." In a contract to furnish parts, parts would be the "supplies to be furnished." In [the contract at issue], however, [the government] contracted for complete cranes. Therefore, complete cranes were the "supplies to be furnished under this contract."

*Id.* at 1113. Applying the *Craft* case's restrictive interpretation of "under this contract," Pinnacle argues that the exclusion in this case "can only be fairly read to exclude coverage for that portion of contract damages composed of amounts owed under the Employment Agreement as opposed to any and all contractually-related damages."

*Craft* is distinguishable because it lacks a term analogous to the continual-renewal term of the employment contract. Under the employment contract, Pinnacle agreed to employ Dr. Fisher indefinitely. When it breached that agreement by terminating him without cause, it owed Dr. Fisher the present value of the amount he would have earned under the contract. Thus, the lost earnings constituted "amounts owed under" the employment contract.

Pinnacle also argues that, at the trial of the underlying case, Dr. Fisher's expert on damages did not focus on "amounts owed" under the employment contract but testified about the amount Dr. Fisher would have earned in the future if he had not been terminated. However, that amount, the present value of his lost earnings, was determined by the jury to be the amount Dr. Fisher was entitled to under the contract when Pinnacle terminated him without cause.

St. Paul cites one case that supports its position, *National Union Fire Insurance, Inc. v. Hospital Affiliates Management Corp.*, 363 N.W.2d 494 (Minn.Ct.App. 1985).[3] In that case, Virginia Medical

---

**3.** St. Paul also cited two other cases in support of its argument. The first case, *Nicolet High School v. Continental Casualty Co.*, No. 89–3142, 1990 WL 135920 (7th Cir.1990) (unpublished), is a 1990 unpublished order of the 7th Circuit. The 7th Circuit's rules provide that such opinions have no precedential value and may not be cited except to establish collateral estoppel, res judicata, or the law of the case. *See* 7th Cir. R. 32.1. Accordingly, we do not consider that case. The second case is a Montana trial court order, *Town of Geraldine v. Montana Municipal Insurance Authority*, No. DV–05–29, 2006 Mont. Dist. Lexis 268 (12th Dist. Ct., Chouteau Cnty., Mont., May 1, 2006), *aff'd*, 347 Mont. 267, 198 P.3d 796 (2008), which concerned an insurance policy that excluded "liability arising out of failure to perform, or breach of, a contractual obligation." *Id.* at *10. That order is distin-

Center entered into a management agreement with Hospital Affiliates and agreed to pay Hospital Affiliates $120,000 per year for five years. *Id.* at 495. Virginia Medical Center terminated the management agreement after paying only $40,000, and Hospital Affiliates sued it for $750,000 for lost profits and goodwill. *Id.* Virginia Medical Center then demanded coverage from National Union, which brought suit for a declaratory judgment that it had no duty to indemnify the medical center for its breach of contract. The insurance policy provided,

> "Loss" shall mean any amount which the Insureds are legally obligated to pay, * * * provided always, however, such subject of loss shall not include * * * any amounts due or payable under the terms of any contractual obligation.

*Id.* The Minnesota Court of Appeals found "the language of the insurance contract unequivocal and clear." *Id.* at 496. The court determined that lost profits were excluded because they "represent sums payable under the management agreement." *Id.* The court determined that the loss of goodwill was excluded because it was "also an element of contract damages, meaning that liability for payment arises by virtue of the contractual obligation," and the policy "expressly excludes those losses from covered losses." *Id.*

Pinnacle argues that the *National Union* case is distinguishable because the policy exclusion uses the phrase "amounts due and payable" instead of "amounts owed," and Pinnacle asserts that "amounts due and payable" is broader than "amounts owed." We disagree. The phrases are essentially synonymous.

In both *National Union* and this case, the contracts provided for long-term em-

guishable because the "arising out of" language of the exclusion is broader than the

ployment and payment. When the contracts were terminated, the employers owed the amounts the employees would have earned under the contracts. The insurance policies of both companies excluded amounts "owed" or "due and payable" "under" a contract. *National Union* is analogous to the case before us and supports St. Paul's interpretation of the exclusion. Like the language in the National Union policy, the language in St. Paul's policy is "unequivocal and clear." *See id.*

We conclude the language of the exclusion supports exclusion of Pinnacle's liability to Dr. Fisher for his lost earnings from the breach of the employment contract. We overrule Pinnacle's first and second issues.

## Ambiguity

In its third issue, Pinnacle contends the exclusionary clause is ambiguous, which required the trial court to rule in favor of Pinnacle. *See Balandran*, 972 S.W.2d at 741. To conclude the exclusion is ambiguous we would have to decide that the policy provision was subject to two or more reasonable interpretations. *See id.*

■ For Pinnacle to prevail, its interpretation of the provision as excluding only the amounts owed to Dr. Fisher for work he had performed before his termination must be reasonable. *Id.* Pinnacle's interpretation fails to consider that the amount owed under the contract is determined at the time of the "Loss," that is, at the time of the judgment, not at the time of termination.

■ Pinnacle argues in its brief on appeal that if the exclusion is interpreted to apply to amounts owed under the contract

exclusion in this case.

at the time of the "Loss," then the exclusion would exclude the $900,000 for past lost earnings but would not exclude the $5 million for future lost earnings, which exceeds the $2 million policy limits. However, Pinnacle did not present this argument in its motion for summary judgment or in its response to St. Paul's motion for summary judgment, and we cannot reverse a summary judgment on a ground not raised below. See TEX.R.APP. P. 33.1(a); *City of Houston v. Clear Creek Basin Auth.*, 589 S.W.2d 671, 678 (Tex.1979); *Pinnacle Anesthesia Consultants*, 309 S.W.3d at 105–06. Furthermore, the "amounts owed under [the] written contract" included the $5 million for future lost earnings.

We conclude that Pinnacle has not shown the exclusion is subject to two or more reasonable interpretations and is ambiguous. We overrule Pinnacle's third issue.

### CONCLUSION

We conclude the trial court did not err by granting St. Paul's motion for summary judgment and denying Pinnacle's motion for summary judgment. We affirm the trial court's judgment.

MOSELEY, J. dissenting.

Dissenting Opinion By Justice MOSELEY.

This case presents a coverage question concerning an insurance policy. The trial court concluded there was no coverage based on an exclusion to the policy, and its partial summary judgments to that effect became part of its final judgment. On appeal, the insured asserts the trial court erred in ruling on the parties' motions for summary judgment because the relevant exclusion is inapplicable based on its clear, plain meaning or, in the alternative, the

exclusion is ambiguous and must be construed in the insured's favor.

The majority of the panel of this Court affirms the trial court. I disagree because, applying the standards of interpretation applicable to exclusions in an insurance policy, I conclude the policy does not exclude the claim at issue. Therefore, I respectfully dissent.

The dispute is between the insurer/appellee, St. Paul Mercury Insurance Company (St. Paul), and the insured/appellant, Pinnacle Anesthesia Consultants, P.A. (Pinnacle). Pinnacle was sued by a former employee for, *inter alia*, wrongful termination of a written employment contract. Pinnacle had an Employment Practices Liability Insuring Agreement (the Policy) with St. Paul. The Policy provided coverage for certain "Losses" resulting from "Wrongful Acts"; when parsed, the definition of "Wrongful Acts" includes "wrongful discharge or termination, whether actual or constructive" and "breach of an actual or implied employment contract."

Pinnacle asserted a claim under the Policy and St. Paul defended the suit under a reservation of rights. The former employee, Dr. Neal Fisher, obtained a judgment against Pinnacle that we affirmed on appeal. See *Pinnacle Anesthesia Consultants, P.A. v. Fisher*, 309 S.W.3d 93 (Tex. App.-Dallas 2009, pet. denied). The judgment included damages—in excess of the Policy's limits—for lost earnings resulting from Pinnacle's wrongful termination of Fisher's contract.

Whether St. Paul is liable to Pinnacle for its policy limits—the only issue in this case—hinges on an exclusionary provision in the Policy. That provision states that the insurer (St. Paul) "shall not be liable for that part of Loss that constitutes ... *amounts owed under a written contract or*

*agreement* . . . ." (Emphasis added.)[1] We must decide whether Fisher's lost-earnings damages resulting from Pinnacle's wrongful *termination* of his contract constitute amounts *owed under* his contract. I conclude they do not.

When interpreting an insurance contract, we apply general contract construction rules to discern the parties' intent, giving each undefined term its generally accepted meaning. *See Gilbert Tex. Constr., L.P. v. Underwriters at Lloyd's London,* 327 S.W.3d 118, 126 (Tex.2010). Additionally, when interpreting an exclusion to an insurance policy

> we "must adopt the construction . . . urged by the insured as long as that construction is not unreasonable, even if the construction urged by the insurer appears to be more reasonable or a more accurate reflection of the parties' intent. Exceptions or limitations on liability are strictly construed against the insurer and in favor of the insured," and

"[a]n intent to exclude coverage must be expressed in clear and unambiguous language."

*Evanston Ins. Co. v. ATOFINA Petrochemicals, Inc.,* 256 S.W.3d 660, 668 (Tex. 2008) (footnotes omitted) (quoting *Nat'l Union Fire Ins. Co. v. Hudson Energy Co.,* 811 S.W.2d 552, 555 (Tex.1991)).

Pinnacle asserts the exclusionary language means—on its face or as a matter of a reasonable interpretation—that the Policy excludes from coverage amounts owed under a contract, as opposed to any and all damages resulting from the breach of a contract. In turn, "owed under" means amounts owed as a result of the operation of the contract, not its termination. St. Paul disagrees; it argues (as it must in order to prevail) that the Policy language means—*and can only mean*—that the Policy excludes from coverage any damages recovered under a breach of (written) contract theory of liability.[2] As noted above,

---

1. The entire exclusion at issue in this case states:

 **Exclusions Applicable to All Coverages of This Insuring Agreement and to Loss Other than Defense Costs**

 The Insurer shall not be liable for that part of Loss that constitutes:

 1. amounts owed under a written contract or agreement: provided that this exclusion shall not apply to:
 (a) Defense Costs;
 (b) to the extent that the Insured would have been liable for such Loss in the absence of the contract or agreement; or
 (c) severance pay owed pursuant to a settlement agreement in a Claim for Loss otherwise covered hereunder if the Insurer consents to the inclusion of such severance pay in such settlement agreement;

 2. compensation earned by the claimant in the course of employment but not paid by the Company including any unpaid salary, wages, or bonuses; provided that this exclusion shall not apply to:
 (a) back pay or front pay; or
 (b) Defense Costs.

 3. fringe benefits, deferred payments (including insurance premiums in connection with an employee benefit plan), stock, stock options or warrants, stock appreciation rights, or similar rights in securities or rights to purchase securities, or the value thereof, or other perquisites, or any amounts that constitute severance pay pursuant to an express written obligation as part of employment termination; provided that this exclusion shall not apply to:
 (a) medical, pension, disability, life insurance or other similar employee benefits or insurance premiums in connection with such employee benefit plans to the extent a judgment or settlement in a Claim for actual or constructive wrongful discharge or termination expressly includes a monetary amount for consequential damages representing such employee benefits or insurance premiums; or
 (b) Defense Costs.

2. St. Paul seeks to buttress this view throughout its brief by referring to the language at issue as the "Contract Damages Exclusion."

we must adopt Pinnacle's interpretation of the exclusion if it is "not unreasonable." *See id.*

Pinnacle's interpretation of the exclusion does not do violence to its language. As noted, the Policy excludes liability for "that part of Loss that constitutes ... *amounts owed under a written contract or agreement ....*" (Emphasis added.) The Policy does not define "under a written contract." Adopting the Webster dictionary definition cited by the majority, the ordinary meaning of "under" is: "required by," "in accordance with," or "bound by."

Keeping these definitions in mind, some damages resulting from breach of contract are "amounts owed under" the contract and some are not. For example, amounts owed under a contract—and excluded from coverage—would include severance pay to a former employee as specified by a contract, or other amounts earned under the terms of a contract (such as salary and other benefits) before the contract was terminated. "Amounts owed under" a contract would also include damages resulting from the incorrect calculation of a salary or a bonus or "draw" to be paid under the contract's terms.

However, some breach of contract damages result—not from the operation of the contract—but from its termination. Unlike a dispute over calculating compensation, lost-earnings damages arise from the termination of the contract, not its operation. Under Pinnacle's interpretation,

those damages would not be excluded from coverage.

I find nothing about Pinnacle's argued interpretation of the Policy to be unreasonable. It does not contravene the terms of the Policy, but instead adheres to the meaning of the text of the Policy. Nor does Pinnacle's interpretation leave the exclusion empty and without meaning. Therefore, we are bound to adopt Pinnacle's interpretation of the exclusion. *See Evanston Ins. Co.,* 256 S.W.3d at 668.[3]

The proper measure of damages in an action for breach of contract "is the benefit-of-the-bargain measure, which seeks to restore the injured party to the economic position it would have been in had the contract been performed." *See Brown v. Ogbolu,* 331 S.W.3d 530, 535 (Tex.App.-Dallas 2011, no pet. h.). The jury findings on which the "Loss"—Fisher's judgment against Pinnacle—was based was consistent with this measure of damages.[4]

Applying the generally accepted meaning of the term "under" to the exclusionary language, the trial court should have concluded the damages awarded to Fisher for lost earnings were not damages awarded "under a written contract." In other words, they did not constitute "amounts owed [as required by] a written contract," "amounts owed [in accordance with] a written contract," or "amounts owed [as bound by] a written contract"; rather, they constitute damages caused by—and owed as a

This language constitutes a label, not an argument.

**3.** Whether St. Paul's analysis of the Policy's exclusion is a reasonable one is not the dispositive issue; St. Paul's construction may be reasonable (or even more reasonable than Pinnacle's) and Pinnacle must still prevail so long as its interpretation also is reasonable. *See Evanston Ins. Co.,* 256 S.W.3d at 668.

**4.** The jury awarded past lost earnings, defined as "the *cash value of* the earnings Dr. Fisher would have received in the past had Pinnacle not terminated him ... *less any amounts actually earned by Dr. Fisher in the past.*" (Emphases added.) It also awarded future lost earnings, defined as "*the cash value* of the earnings Dr. Fisher would, *in all reasonable probability,* earn in the future, less any earnings, had Pinnacle not terminated him without "Cause." (Emphases added.)

result of—the wrongful *termination* of a written contract.

Because the plain language of the Policy shows that the damages awarded to Fisher were not awarded "under a written contract" and, alternatively, because I find Pinnacle's interpretation to be reasonable, I conclude the exclusion at issue here does not exclude the damages awarded to Fisher from the Policy's coverage. I would reverse the trial court's judgment and render judgment declaring that St. Paul owes Pinnacle its applicable policy limits under the Policy.